## HIRAM PRATHER v. STATE.

No. A-10189.   April 28, 1943.

(137 P. 2d 249.)

W. J. Hulsey, of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and S. H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, P. J. This is an appeal from a conviction for murder with the sentence of death in the district court of Pittsburg county.

The charge of murder of Warden Jess Dunn filed against the defendant, Hiram Prather, is an outgrowth of an attempt on the part of four long-term convicts to

escape from the State Penitentiary, which attempt resulted in the death of Warden Jess Dunn, Deputy Sheriff Tab Ford and three of the four convicts. The defendant, Hiram Prather, was the only convict who survived.

The facts established by the proof of the state show that about 10 a.m. on Sunday morning, August 10, 1941, Warden Jess Dunn was in the prison yard at the State Penitentiary with one J. H. Fentriss, who had been employed by the State Board of Public Affairs to install a communication and public address system at the Penitentiary. Warden Dunn and Fentriss were in the yard making a check to determine where to install the communication equipment when they were seized from behind by four convicts, three of them armed with sharp dirk knives and one of them with a razor. The knives and razor were held at the throats of both Dunn and Fentriss, their hands were tied behind them, and with a convict on each side of them Warden Dunn and Fentriss were marched to the first of two east gates of the Penitentiary. A few minutes' controversy there occurred before the guards at the tower in charge of the first gate would open the gate to allow the four convicts and the two kidnapped men to pass. It was only after one of the convicts, holding a sharp knife to the breast of Warden Dunn, had commenced pressing the knife toward the heart of the warden to where blood was streaming out of the wound and showing on the warden's shirt, that the guard in charge of the gate opened the same to allow them to pass. A short distance from the first east gate was a second gate which formed the outer boundary of the prison walls. Another argument with the guards at this gate occurred which finally resulted in the guards lowering a pistol and a 30-30 Winchester rifle which were seized by the convicts. After passing through the outer gate the convicts, together with

their hostages, seized an automobile and commenced to flee.

During the period of time which had been taken by the arguments with the tower guards, the officers of Pittsburg county had been notified and Deputy Sheriffs Bill Alexander, Bob Pollock and Tab Ford drove to the Penitentiary. They arrived shortly after the convicts had fled and immediately commenced pursuit. The convicts took a road from the Penitentiary which led to a barrier where the road was being repaired. When they reached this barrier they turned their car and started back. Deputy Sheriff Alexander saw them approaching and blocked the road with his automobile, forcing the convict car to stop. A gun battle ensued between Deputy Sheriff Alexander, armed with a rifle, and the convicts, resulting in the deaths of the parties hereinbefore mentioned. The defendant Prather, together with convicts Beavers and Anderson, attempted to flee from the car after it stopped and take refuge in a ditch adjacent to the road. After Alexander had killed Beavers and Anderson, Prather came out of the ditch with his hands in the air and surrendered. Warden Dunn and convict McGee were both dead in the front seat of the automobile. The proof showed that Warden Dunn had been shot three times in the back of the head, close to the right ear, by one of the convicts armed with a pistol.

The testimony of all of the witnesses was to the effect that the man who sat on the right side of the rear seat was the one who fired the shots that killed Warden Dunn and the proof showed that the defendant was the convict who sat at this position.

In this connection the witness Fentriss testified that he was sitting in the middle of the back seat. He further testified as follows:

"Q. (By Mr. Hulsey, counsel for defendant) Do you say and tell this jury that Prather, the defendant, was the man that was sitting at your right? A. Yes, sir. Q. Did you see him with a gun? A. Yes, sir. Q. What kind of gun? A. Pistol."

He further testified that when the shooting commenced he rolled over to the bottom of the car and did not actually see the shots fire that killed the warden.

Officer Alexander also testified that the convict on the right-hand side of the rear seat was armed with a pistol and fired the first shot.

None of the three bullets fired into the head of the warden emerged, but two of them were removed and a ballistic expert testified that he fired a test bullet from the pistol used by the convicts and that this test bullet, when compared with the two bullets removed from the head of Warden Dunn, showed conclusively that they had all been fired from the same gun.

It is apparently undisputed that Warden Dunn was killed by a pistol in the hands of one of the convicts, but it was the contention of the defendant that the shots which killed the warden were fired by convict McGee and not the accused. This contention is not based on any testimony of the defendant, as no evidence was offered in his behalf, but is based wholly upon a discrepancy appearing in the testimony of one of the state's witnesses, who said that the convict who did the shooting had on what is described as weed-row clothes, which were blue denim with small stripes, while the testimony of the Deputy Warden showed that the defendant Hiram Prather had been working in the mess hall and was dressed in white.

Another physical fact, however, disputing the claim of defendant that Roy McGee fired the fatal shots at the

warden, was the fact that McGee was sitting in the front seat with the warden and was found slumped over dead against the warden after the shooting had ended. The fact that the warden was shot in the back of the head, close to the right ear, makes it practically physically impossible for the convict McGee to have fired the fatal shots.

But irrespective as to which of the convicts actually fired the shot which killed the warden, they were all equally guilty of murder for the reason that they were jointly engaged in a conspiracy to commit a felony and the killing arose out of the commission of that felony, making all of the joint participants equally guilty of murder under the law.

In the brief of the defendant two contentions are presented: First, the admission in evidence of a written confession allegedly given by the defendant but which was never signed by him. Second, the punishment was excessive under the facts.

The statement in question is one given by the defendant in the warden's office at the State Penitentiary a few hours after the attempted escape, in the presence of the county attorney, two deputy wardens and the county attorney's stenographer who took stenographic notes of a conversation had between the county attorney and the defendant. When the county attorney's reporter took the witness stand to testify concerning this incident, she swore that she took accurate stenographic notes of all the questions asked by the county attorney and the answers given by the defendant, and that subsequently she correctly transcribed her stenographic notes of said proceeding. After the transcript was prepared the statement was never presented to the defendant for his signature and one of the objections now raised pertains to the fact

that the instrument in writing was not admissible in evidence without the signature of the defendant, but could only be used for the purpose of refreshing the memory of one of the parties who was present at the time of the transaction.

When this witness first identified the written statement, counsel for defendant objected to its introduction for the reason "that defendant was not informed of his constitutional rights before the statement was made." When this objection was made the trial court excused the jury and in the absence of the jury heard the evidence offered by the county attorney of the facts surrounding the examination of the accused. These parties testified that said statement was freely and voluntarily made, no promises given nor threats made, nor any statements made to induce the defendant to make the statements. The defendant did not testify on this question and no one disputed the testimony of the parties who were present that the defendant freely and voluntarily answered the questions asked by the county attorney.

The statement itself is not so important and did not shed any light upon the background of the attempted escape nor relate any facts which were not proved by other witnesses, and in the statement the defendant specifically denied firing the shots which killed the warden, but stated that he was armed with a rifle. The only damaging statement made by the defendant, insofar as the questions as to who actually shot the deceased Jess Dunn was concerned, was his admission that he was riding on the right-hand side of the rear seat. This admission of the defendant is important because it was definitely established by all of the witnesses for the state that the shot that killed Warden Dunn was fired by the convict who was riding on the right-hand side in the rear seat.

In Mays v. State, 19 Okla. Cr. 102, 197 P. 1064, 1065, it is stated:

"The fact that the defendant was under arrest and in jail, and was not warned that any statement made by him might be used against him, will not affect the admissibility of any voluntary statement made by him, which would otherwise be competent.

"The fact that statements of the defendant offered as a confession of murder were made to the arresting officer in answer to questions which assumed his guilt, and that the officer told him that it would be better to tell the truth, does not show that the confession was not voluntary."

In Jewell v. State, 41 Okla. Cr. 389, 273 P. 366, 367, we held:

"A statement freely and voluntarily made by a defendant, otherwise competent, is not rendered incompetent by the fact that he was under arrest at the time, was not represented by counsel, and that same was made in response to questions propounded by the officers for the state."

See, also, O'Neil v. State, 38 Okla. Cr. 391, 262 P. 218; Tarkington v. State, 41 Okla. Cr. 423, 273 P. 1015; Anderson v. State, 8 Okla. Cr. 90, 126 P. 840, Am. Cas. 1914C, 314.

In all of these cases the real question for determination is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from the fear of the threat, or hope of profit from the promise.

The court, in the instant case, imposed a greater burden on the state than required by law for the reason that prima facie all confessions are presumed to be voluntary and admissible in evidence and the burden is on defendant, if the same is challenged, to show that the same

was made under such circumstances as to render it involuntarily made and inadmissible. Here the trial court, in order to be exceptionally fair to the accused, required the state to assume the duty of proving in the first instance that the statement was voluntarily made. This was done. No counter-showing was offered by the defendant and the statement was admitted in evidence. After admitting the same in evidence the court, by proper instruction, submitted the question to the jury as to whether it was voluntarily made, and further advised the jury that if they were of the opinion that the statement was involuntarily made they should disregard the same.

We cannot agree with counsel's contention that the statement which was reduced to writing was inadmissible for the reason that the same was not signed by the accused. Here it appears undisputed that the reporter took all of the statements made by the accused and correctly transcribed the same. One of the chief reasons that courts view alleged admissions of guilt with caution is because there is sometimes a tendency by over-zealous officers, when statements are orally made, to add or detract from some of the words used by the accused to lend color to his admissions. This same objection is not possible where a reporter takes down the identical words and correctly transcribes them.

In Bosko v. People, 68 Colo. 256, 188 P. 743, it is held:

"Where a stenographer who took the confessions of defendants in form of questions and answers testified that the confessions as transcribed by her were correct, the confessions were admissible without proof of the signatures of defendants affixed thereto." In discussing this proposition the court stated: "It is contended that these confessions were inadmissible because the signatures thereto were not proven. The absence of such proof is

wholly immaterial. They did not depend thereon for their admissibility. Had the signatures been proven, the confessions might have been admitted without the testimony of the stenographer. They would then have depended for their admissibility upon the proof of the signatures and been admitted under the rule governing written confessions. In the absence of such proof their admissibility rested entirely upon the evidence of the stenographer who took them. Her testimony is not of the execution of written documents, but of oral conversations, supplemented by the transcript of those conversations from her shorthand notes and the presentation thereof to the court; hence the objection is without merit."

In State v. Haworth, 24 Utah 398, 68 P. 155, 156, it is held:

"A purported confession of defendant in a homicide case, taken down in writing by the person to whom the confession is made, is admissible, though not signed by the defendant."

We come now to the consideration of the contention of counsel that the punishment assessed the defendant is excessive. Counsel's argument is based solely upon the proposition that the accused did not fire the fatal shots. In the first place, as shown by the evidence hereinabove discussed, the jury would have been fully justified in concluding beyond a reasonable doubt that the defendant was the person who fired the shots that killed Warden Dunn. But aside from that fact, the proof conclusively showed that the defendant and the other convicts conspired together to commit a felonious act, to wit, to escape from the Penitentiary, and during the existence of this conspiracy and while in furtherance thereof, the warden was killed; then, under our law, the defendant is just as guilty of the crime of murder as if he, instead of one of his associates, as is claimed by him, fired the fatal shot. Turner v. State, 8 Okla. Cr. 11, 14 126 P. 452; Holmes

v. State, 6 Okla. Cr. 541, 542, 119 P. 430, 120 P. 300; Davis v. State, 31 Okla. Cr. 109, 237 P. 471.

It is our view that irrespective of the question as to whether the accused or his confederates fired the fatal shot, the facts are such as justify the exaction of the extreme penalty fixed by the law. It is well that the citizens of Pittsburg county by their verdict have warned that convicts who attempt to escape from the walls of the State Penitentiary and kill another person while so doing shall pay the extreme penalty. This was a most willful and vicious murder without any extenuating circumstances. Prior to firing the fatal shots into the warden's head the convicts had repeatedly stabbed and tortured him with their knives to try to force him to give orders to the tower guards and later to the deputy sheriffs who overtook them. The only explanation of the warden's death is that the convicts, seeing their attempted escape was being thwarted, shot the person who to them was a living symbol of the officers of the law who were blocking their escape. A kindly and efficient warden, loyal to his trust, was killed by the dastardly acts of defendant or one of his fellow conspirators. Any other verdict than the extreme penalty would have been a travesty upon justice and an open invitation to the convicts, especially those who were already under life-sentence for crimes committed by them, to take the law into their own hands and kill and kill and kill, if need be, to effect a getaway, knowing that if frustrated their punishment would be no greater than the sentence which they were already serving.

On account of the gravity of this case, and by reason of the fact that the death penalty has been imposed, we have scrutinized the record carefully to see whether any error was committed which is sufficient to require this

court to reverse the judgment or modify the sentence which was imposed. We have found none.

The judgment of the district court of Pittsburg county is accordingly affirmed.

The time originally appointed for the execution of the defendant Hiram Prather having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Pittsburg county be carried out by the electrocution of the defendant Hiram Prather by the warden of the State Penitentiary at McAlester, Okla., on Wednesday, July 14, 1943.

BAREFOOT and DOYLE, JJ., concur.