# HALL *v.* STATE

[No. 247, September Term, 1959.]

*Decided July 8, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Robert J. Dougherty*, with whom was *William R. Sutton* on the brief, for the appellant.

*John Martin Jones, Jr., Assistant Attorney General*, with whom were *C. Ferdinand Sybert, Attorney General*, and *Frank H. Newell, III, State's Attorney for Baltimore County*, on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The defendant-appellant, Leonard Hall, Jr., was indicted on a charge of murder, was found guilty of murder in the first

degree by a jury in the Circuit Court for Baltimore County, and was sentenced to death. He appeals.

He raises four questions (though not in the order here stated):—(a) whether the trial court erred in admitting into evidence a memorandum of an oral statement by the defendant and thereafter withdrawing it without properly instructing (or informing) the jury as to the ruling; (b) whether oral statements of the defendant were inadmissible by reason of prolonged interrogation, promises, threats and fears; (c) whether two witnesses should have been permitted to read to the jury alleged oral statements of the defendant taken down by them; and (d) whether the defendant was prejudiced by the alleged misconduct and inattention of some of the jurors.

Question (a) appears to be based upon a misapprehension of facts shown by the record. The two judges before whom this case was tried in the Circuit Court conducted a full and lengthy preliminary hearing out of the presence of the jury with regard to the admissibility of two oral statements made by the defendant (each of which statements had been reduced to writing). The court at first ruled that one of these statements (marked for identification as State's Exhibit 30), which had been taken down by Detective Davis, was admissible in evidence, and seems to have been on the point of making a similar ruling with regard to the other statement, a transcript of stenographic notes made by Mr. Perkins, a court reporter, of a police interrogation of the defendant. As a result of a colloquy which began when Detective Davis was on the stand and was renewed during Mr. Perkins' testimony, the court reversed its ruling as to State's Exhibit 30 and did not admit Mr. Perkins' transcript, which was marked for identification as State's Exhibit 32.

When the jury was recalled it was agreed by stipulation of counsel for the State and for the defendant that the testimony taken in open court (but not in the presence of the jury) relating to the admissibility of these oral statements should be read to the jury by the court reporter, Mr. Danker. This was done, but the reading was stopped by the court at the point where the colloquy began which resulted in Exhibit 30 being first admitted but later being held inadmissible. When this point was reached a conference was held between court and

counsel for both sides, out of the presence of the jury, as a result of which it was explicitly stipulated that no more of the proceedings before the court but out of the presence of the jury should be read to the jury. The result was to omit the reading of certain testimony of Detective Davis and testimony of Mr. Perkins relating to the respective statements taken down by them. Each of them was then called to testify with regard thereto before the jury.

When Detective Davis was so called, he was first asked whether he had taken notes of his conversation with the defendant at the Parkville Police Station. He replied that he had. He was next asked if he had those notes with him. To this he answered, "They are admitted as an exhibit, sir." The court very promptly corrected this statement and made it clear that the notes had been marked for identification as (State's) Exhibit 30, but that they were not in evidence. This was a correct statement of the facts as shown by the record.

The appellant's brief, however, states: "It is submitted, without authority, that the Appellant was prejudiced when the trial court erroneously admitted into evidence the State's Exhibit No. 30 (E. 265, 266) as being a memorandum of the Appellant's oral statement and thereafter rejecting the Exhibit as documentary evidence. The error could only have been harmful because the jury at one point was advised through the testimony that it was admitted and was not thereafter advised that it was rejected or withdrawn. The impression made upon the jury was unquestionably prejudicial." Without considering at this point the legal correctness or incorrectness of the trial court's rulings on the admissibility of this exhibit, we think it quite evident from the record that the contentions above quoted from the appellant's brief as to failure of the trial court properly to advise the jury of its rulings are completely lacking in factual support.

A brief outline of the facts of the case pertinent to questions (b) and (c) is as follows:

Anna Gaff, aged 66, resided with her husband John T. Gaff, aged 78, on the premises in which they conducted a tavern on Back Neck River Road, at Essex in Baltimore County. On the night of July 15-16, 1959, Anna Gaff was

gagged, bound and stabbed to death in the kitchen on the ground floor of the building. A kitchen knife was found driven into her back up to the handle, and she had been stabbed six times besides. Cigar boxes usually containing some $700 or more in cash, a safe deposit key and other keys with a metal tag bearing Mr. Gaff's name were missing. The tavern had closed before the murder was committed. Mr. Gaff had gone to bed and to sleep in a room on the ground floor somewhat removed from the tavern and kitchen; an aged Negro handyman, who occupied a room in the cellar had also gone to bed and to sleep. Neither heard any sounds during the robbery and murder. Mr. Gaff discovered his wife's body at about three o'clock in the morning of July 16th. The police were promptly notified and arrived on the scene within a few minutes. There were no eyewitnesses of the murder.

On the afternoon of July 16th, while the police were still searching for clues and evidence at the Gaff tavern, the defendant, who had been sitting in the tavern, came up and asked one of the officers if he was working on the case and inquired whether there were any fingerprints. He stated, "Well, if you got fingerprints you will catch the person who did it." The defendant told the police officers that he had been at the Gaff tavern the night before, that he knew "Mom and Pop" well and often came into the place and that he had stopped in to pay his respects. In response to the police sergeant's inquiry he gave his name and gave his address as the Ritz Hotel in Baltimore, and said that the police could get hold of him if they wanted to talk to him. He then left the tavern.

The police sergeant called his lieutenant just after this talk and they agreed that it would be well to get Hall in for further questioning. The police located him at another tavern in the neighborhood, and he then willingly went with them to the Essex Police Station.

Hall was picked up at about 6:25 P. M., questioning began at 8:07 P. M. and it continued until 12:28 A. M. He said that he had recently come from New Jersey and was staying at the Ritz Hotel in Baltimore. The officers had ascertained that there was no hotel of that name in Baltimore and so told the defendant. At least one other discrepancy developed in

his statements, but he made no incriminating admissions. Hall agreed to go with the police in their search for the hotel where he was actually staying. On the way he said that maybe he had told the police enough already, that he would not tell them where his hotel was and that he thought he ought to see a lawyer. The police replied that that was his privilege and the subject does not appear to have been pursued further. He also expressed a desire to see a minister, which the police agreed he might do.

Hall proceeded to guide the officers to the Edison Hotel, near Fayette and Gay Streets, in Baltimore. He gave the officers the number of his room and sat in a police car while the "evidence squad" searched his room. They found the keys and tag and the cigar boxes above referred to under a chair in the appellant's room. The cigar boxes contained over $420 in bills and change and two checks later identified by customers as having been cashed at the Gaff tavern. Just before 1 A. M. on July 17th, while awaiting the result of the search, Hall covered his face with his hands and said to the two detectives with him: "I am not afraid to die, I just don't want to go to hell." When informed by the evidence squad that certain evidence had been found in his room, he said: "If you will take me to a station, I will tell you all about it." They then set out for the Parkville Police Station and, while en route, Hall said: "I don't know why I did it, I don't know, I just don't know."

When Hall arrived at Parkville he was taken to an interrogation room where he made a statement between 1:57 A. M. and 2:25 A. M. Detective Davis took very full notes of this statement in longhand—in fact, the entire statement, word for word, he testified. The remainder of this paragraph is based upon Detective Davis' testimony with regard to this statement. In it the defendant described the robbery or larceny in detail and the binding and gagging of Mrs. Gaff. He said that Mrs. Gaff must have gotten the gag loose and started "hollering for help." At this point Hall said: "I don't know what happened. I just don't know what happened." He further said: "I must have killed her, but I don't know." He said he must have grabbed a knife, that he didn't know

where it was when he grabbed it, that he had a gun, but didn't want to shoot Mrs. Gaff, that that was why he tied and gagged her. Hall then spoke of a pillow which he took from the Gaffs' bedroom. He later said, "I took the pillow back to the storeroom after I killed her."

Mr. Perkins, a court reporter for the Circuit Court for Baltimore County (though not acting in his official capacity), was summoned from his home and he took down in question and answer form a further interrogation of Hall by Captain Adams of the County Police. (He had with him in court both his original stenotype notes and a transcription thereof.) This oral statement was in general an amplification of Hall's previous statement as recorded by Detective Davis, and, like it, was a full admission of the robbery or larceny. As to the stabbing he again said that he didn't know what happened after Mrs. Gaff got the gag loose and began to "holler" for help. He was then asked the direct question, "Did you stab Mrs. Gaff?" He answered, "I guess so," and amplified this under further questioning by saying, "Well, I must have stabbed her." He denied knowing how many times he had stabbed her and said he would have shot her if he wanted to kill her. A question or two later, when asked how he knew she was stabbed to death, he answered: "The paper says she was stabbed to death. The people at the bar said she was stabbed to death, so I must have done it." Two questions later he said he couldn't remember he stabbed Mrs. Gaff or what he did with her. Some time thereafter when questioned as to whether he had stabbed Mrs. Gaff before putting the pillow back (this question seemingly being based on Detective Davis' notes of the earlier statement), Hall concluded his answer by saying: "I don't know. I must have stabbed her. After she started hollering, I don't know." Hall's statements, as reported, about everything but the knife and the stabbing do not seem to show any lapse of memory or confusion as to details. This interrogation lasted from 3:27 A. M. to 4:15 A. M., July 17th.

The defendant testified on the admissibility of these statements. He claimed that one of the officers had promised to put in his notes that Hall had "cooperated" and so to inform the judge if Hall would tell the truth and give a statement.

He also claimed that Captain Adams had talked and acted roughly at the Essex Police Station, slamming his fist on the table and calling Hall a "damned liar" and saying he wanted the truth; but Hall denied being afraid of him and said that he told Captain Adams "if you hit me, I will tell you nothing." Hall makes no claim that he was struck at any time and said that Captain Adams "didn't exactly threaten me." He claimed that while he was outside the Edison Hotel, the police said they were going to keep him until he made a statement. He admitted that they did not say that they were going to force a statement out of him, but claimed they said they would keep him until he made one. He said that he made the statement because he was scared and wanted to be by himself (in a cell at a police station). He was asked whether, while he was in custody, anyone ever asked "if you were mistreated or promised anything." He said that such a question had been asked and that his reply was "No, I been treated nice." He was then asked if that answer was truthful and he replied, "Yes, sir, I been treated nice." The only promise which he asserted had been made was that an officer had "promised me that he would put it in his report if he would cooperate." Hall himself did not testify that he had asked to see a lawyer and the only testimony on that subject was that of the police above set forth.

The police officers denied any threats or promises of any kind. Captain Adams admitted having slapped his open palm (not his fist) on the desk and having called the defendant a "damned liar."

During the night of the interrogations the defendant was given cigarettes, Coca Cola, coffee and perhaps doughnuts. It does not appear that he asked for more food or that he asked for rest. Mr. Perkins, the court stenographer who took down his last statement, testified that Hall was very deliberate and quite often would hesitate in his answers, but could not say whether this was due to fatigue.

Neither of Hall's statements was read back to him and he did not sign either of them at any time.

Detective Davis and Mr. Perkins each testified to the fact of the defendant's making the oral statement which he had re-

corded, each testified that his recording had been made as the statement was given and that his recording (in one case longhand, in the other by stenotype) was correct when made. Neither felt able to give accurately and fully the statement recorded by him even after refreshing his recollection by reading the statement. Mr. Perkins was more positive as to his lack of recollection, refreshed or otherwise, of the defendant's statement than was Detective Davis. Detective Davis was permitted virtually to read to the jury from the longhand statement which he had taken down. Mr. Perkins was permitted to read the questions and answers from his stenotype notes. Neither Davis' written statement nor any transcript of Perkins' notes was admitted as documentary evidence.

The question of the voluntary and uncoerced character of the statements was first passed upon by the court and resulted in their being admitted in the manner stated. The question of whether the statements were voluntary or were obtained by force or threats or by holding out any hope or promise for their obtention was also squarely submitted to the jury, and the jury was instructed that a confession might be considered if the jury found that it was freely and voluntarily made, but not if it was obtained by force or threats or by inducements holding out hopes or promises to the accused. The jury was also instructed that these confessions, if valid, constituted "verbal" confessions, notwithstanding that they had been written down, and that the defendant could not be convicted on an [extrajudicial] confession alone, without independent evidence tending to prove that the crime had actually been committed by someone. The only exception to the instructions taken by the defendant was because of the court's refusal to instruct the jury that there was no legally sufficient evidence to establish a premeditated murder. Neither this exception nor any other objection to the charge is raised on appeal.

During the several questionings of the defendant there were always at least two police officers present, and at times as many as four.

There is no claim that the defendant was immature, ignorant or of deficient mentality. His exact age is not shown, but one of the statements shows that he was old enough to

have been married and (presumably) divorced, since he said that one of the reasons why he needed money was that he was behind in his alimony payments.

In considering appellant's contention that his admissions or oral confessions (which we shall refer to below as confessions) were improperly obtained, we start with the rule that "[b]efore a confession can be admitted in evidence, the State must show, to the satisfaction of the court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess. If, after a consideration of both the evidence of the State and the evidence offered by an accused (if any be offered by him) regarding the matter, the court is of the opinion that the evidence shows, *prima facie,* that the confession was freely and voluntarily made, it should be admitted in evidence; and, if not, it should be rejected. The matter, in the first instance, is for the court, and involves a mixed question of law and fact. When admitted in evidence it is *prima facie* proof that the confession was freely and voluntarily made, but the ultimate fact is for the jury, and must be considered by it in the light of all the facts and circumstances of the case." (*Smith v. State,* 189 Md. 596, 603-4, 56 A. 2d 818, 821, quoted with approval in *Linkins v. State,* 202 Md. 212, 222-223, 96 A. 2d 246.) And if the court decides to admit the confession, "the same evidence is then given to the jury, as it has the final determination, irrespective of the court's preliminary decision, whether or not a confession is voluntary, and whether it should be believed. In so doing, the jury is entitled to have before it all of the evidence which affects the voluntary character of the document, and which the court passed upon in admitting it." *Linkins v. State, supra,* 202 Md. at 223, citing and quoting from *Day v. State,* 196 Md. 384, 399, 76 A. 2d 729, 736. See also *Peters and Demby v. State,* 187 Md. 7, 48 A. 2d 586, *Jones v. State,* 188 Md. 263, 52 A. 2d 484, and *McCleary v. State,* 122 Md. 394, 89 A. 1100, all cited in *Linkins;* and *Edwards v. State,* 194 Md. 387, 71 A. 2d 487; *Jackson v. State,* 209 Md. 390, 121 A. 2d 242. If there is a

conflict of testimony as to how the confession was obtained that is to be resolved in the first instance by the court and ultimately by the jury. See the cases above cited and *Cox v. State*, 192 Md. 525, 536-537, 64 A. 2d 732.

In the instant case, if the alleged promise to include in the police report a statement that the defendant had "cooperated," amounted to such an inducement as would vitiate these confessions (a question which we do not pass on), there was ample evidence to support a finding that no such promise had been made. The desk thumping and calling the defendant a liar did not, according to his own testimony, intimidate him and there is no indication that any force or violence was used, and the claim that the police had threatened to hold him until he did make a statement was flatly denied.

Nor do we think that the evidence as to the length of the questioning or the circumstances under which it was conducted mounts up to a showing of coercion. The statement which the appellant blurted out on the way to Parkville— "I don't know why I did it" and so on—came shortly after one o'clock, which was about five hours after questioning had begun, and the questioning does not appear to have been so conducted as to wear the defendant down either physically or mentally. There is no showing of any personal indignities having been visited upon him (cf. *James v. State*, 193 Md. 31, 43-44, 65 A. 2d 888; *Jackson v. State, supra,* 209 Md. at 395), nor is there any showing of the use of "third degree" or "brainwashing" methods either before or after the appellant reached the Parkville Police Station. By the time he got there he appears to have decided to go ahead and tell his story, and he did so twice.

The length of the questioning was, we think, well within limits which have been held permissible. *Cox v. State, supra* (arrest about 12:30 A. M. May 26; questioned 3 A. M.- 5 A. M., May 26; 12:30 A. M.-3:30 A. M. and 6 A. M.- 7:15 A. M., May 27; 1 A. M-4 A. M. and 7:50 A. M.- 10:50 A. M., May 28; questioning done in early morning hours because police officers assigned to case were then on duty); *James v. State, supra* (arrested 10:45 P. M. July 6; questioned 12:15. A. M.-1:30 A. M., July 7; in cell till

2:55 P. M. that day, mostly sleeping, then taken out by police for trip; returned to cell 7:25 P. M. and remained there until 8:20 A. M., July 8; questioned intermittently that day and again taken on a trip in the afternoon during which he confessed orally; further questioned for confession 8:03 P. M.-8:43 P. M.; signed confession after transcription about 10 P. M.); *Grear v. State,* 194 Md. 335, 71 A. 2d 24 (arrested 8:55 A. M.; put in line-up 10 A. M., then questioned for half hour; questioned 10:45 P. M. that night to 1:30 A. M. next day and gave confession during this time); *White v. State,* 201 Md. 489, 94 A. 2d 447 (intermittent questioning of disputed extent over several days); *Merchant v. State,* 217 Md. 61, 141 A. 2d 487 (arrest at 11:20 A. M., sporadic questioning that day; at 8:30 P. M. defendant inquired if it would be better for him if he told the truth; statement containing a number of admissions given 9:50 P. M.-11:35 P. M.). See also *Grammer v. State,* 203 Md. 200, 219 et seq., 100 A. 2d 257, cert. den. 347 U. S. 938.

The fact that an accused is under arrest at the time of a confession does not of itself constitute duress and so make his confession inadmissible, nor does the fact that he is without counsel necessarily make it so. *Cox v. State, supra.*

Nor do we think that this case presents any violation of the defendant's right to due process under the Fourteenth Amendment. The only case which he cites on this point is *Blackburn v. Alabama,* 361 U. S. 199, 80 S. Ct. 274, in which the facts were very different. There the evidence established the "strongest probability" that the defendant "was insane and incompetent at the time he allegedly confessed." He had then been subjected to eight or nine hours of intensive questioning, with only an hour's break for dinner. We think there is no suggestion of insanity or incompetence here and, as we have already said, that the questioning did not go beyond permissible bounds. The Supreme Court again reaffirmed the doctrine that "coercion can be mental as well as physical" (80 S. Ct. 279); but in the instant case we do not think that the evidence establishes either.

Cases decided by the Supreme Court under the Fourteenth Amendment stress the rule that all of the circumstances of the

confession, including the length of questioning, the treatment of the prisoner, threats, intimidation, holding him incommunicado, and the age, intelligence, education and condition of the prisoner and any inducements held out to him, must be considered in determining whether the confession was voluntary. Where the questioning has been for periods comparable to the period here involved and it was not shown that there had been any special disability, threats, inducements, personal indignities or denial of sleep or food, it has been held that the confession cannot be said to be involuntary, at least so far as the due process clause of the Fourteenth Amendment is concerned. See *Crooker v. California,* 357 U. S. 433; *Ashdown v. Utah,* 357 U. S. 426; *Cicenia v. Lagay,* 357 U. S. 504; and *Stein v. New York,* 346 U. S. 156.

We find no basis for overturning the ruling of the trial court in admitting the confessions in evidence or for concluding that the jury could not have properly found that they were made voluntarily and were obtained without the use of force or violence, threats or coercion (physical or mental) and without holding out or offering any inducements or promises therefor.

The appellant's main contention is that the witnesses Davis and Perkins should not have been permitted to testify as they did from their records of the confessions. We think this contention untenable.

The problem, as both sides agree, falls within the class of evidence termed by Wigmore "past recollection recorded" and frequently, if not generally, so referred to, though it is often discussed under the general heading of refreshing recollection. See a very comprehensive note entitled "Refreshment of recollection by use of memoranda or other writings," 125 A. L. R. 19, which follows the A. L. R. report of *Kinsey v. Arizona,* 49 Ariz. 201, 65 P. 2d 1141, 125 A. L. R. 3.

It may be agreed that there is considerable diversity of opinion with regard to this matter. There does not seem to be any real doubt that a witness who heard the statement of the defendant could testify from recollection as to what was said or that he could use his notes made at the time to refresh his recollection. The problem in this case arises as to De-

tective Davis because he felt that he could testify with considerably greater accuracy from his notes than from his recollection, even from his recollection as it might be refreshed by his notes. Mr. Perkins had no independent recollection of what the defendant had said.

There is little which we could add to Professor Wigmore's discussion of the subject, which will be found in 3 Wigmore, *Evidence* (3rd Ed.) §§ 725-757. As he says in § 725, p. 58: "The general canon applicable to Recollection is simple: The Recollection should (so far as may be expected) *correspond to and represent the impressions originally gained by observation.*" Where, as here, the past recollection recorded is vouched for as to accuracy by the person who made the record and it has been made at the time of the statement, Wigmore strongly favors its admissibility. He is firmly opposed to the qualification added by some courts to the effect that it is admissible only if the witness has no present recollection. See § 738, where he says: "A faithful memorandum is acceptable, not conditionally on a total or partial absence of a present remnant of actual recollection in the particular witness, but unconditionally; because for every moment of time which elapses between the act of recording and the occasion of testifying, the actual recollection must be inferior in vividness to the recollection perpetuated in the record." It is Wigmore's view (§ 754) that after the witness has testified from the record, the record itself is admissible in evidence.

Perhaps the leading case on the subject is *Kinsey v. Arizona, supra,* in which, 125 A. L. R. at pp. 13-14, the Supreme Court of Arizona said: "Regardless of the weight of the authority on the question, it seems to us that upon every principle of logic and common sense, evidence of this class should be admissible. It is an undisputed and undisputable fact the human memory weakens with the passage of time, more with some individuals, less with others, but to some extent with all, and that a written record, unless changed by extrinsic forces, remains the same for all time. It would seem, then, that such a record made contemporaneously with the event by a witness who was honest and capable of observing accurately what happened, would be far better proof of the

174

true facts than the present recollection of that same witness six months later, whether unrefreshed or refreshed by some extrinsic aid, but still in the last resort presumably independent in its nature. There are but two objections to the use of such evidence which have been seriously urged. The first is that it is hearsay in its nature, and the second, that the witness who vouches for the record cannot be properly cross-examined. We think both of these objections are without foundation. The recorded memory of the witness is just as much the statement of that witness as to what he personally saw or heard as is his present independent recollection of the same fact. * * * But when the person who witnessed the event testifies to the accuracy of the memorandum as made, that memorandum is just as much direct and not hearsay evidence as the language of the witness when he testifies to his independent recollection of what he saw. The objection in regard to cross-examination, on its face, might seem to have some weight, but we think a careful analysis of the question will show that it also is unfounded. What is the purpose of cross-examination? Obviously it is to convince the triers of fact, in some manner, that the testimony of the witness is untrue, for if the cross-examiner accepts it as true, there will be no need nor desire for cross-examination. How, then, may the truthfulness of the evidence of a witness be attacked through cross-examination? It seems to us that all attacks thereon must be reduced to one of three classes: (a) Upon the honesty and integrity of the witness; (b) upon his ability to observe accurately at the time the incident occurred; and (c) upon his accuracy of recollection of the past events. When a witness testifies as to his present recollection, independent or revived, he may, of course, be cross-examined fully on all three of these points. When he testifies as to his past recollection recorded, he can be examined to the same extent and in the same manner as to the first and second of these matters. He cannot well be cross-examined on the third point, but this is unnecessary, for he has already stated that he has *no* independent recollection of the event, which is all that could be brought out by the most rigid cross-examination on this point when the witness testifies from his present recollection, independent or revived."

The arguments of Professor Wigmore and of the Supreme Court of Arizona as to the reliability of past recollection accurately and promptly recorded are convincing to us. See also the annotation in 23 A. L. R. 2d, beginning at p. 919, following *State v. Cleveland,* 6 N. J. 316, 78 A. 2d 560, 23 A. L. R. 2d 907, which seems to reach an opposite conclusion from the following cases cited in that annotation beginning at p. 924: *Bosko v. People,* 68 Colo. 256, 188 P. 743; *People v. Reed,* 333 Ill. 397, 164 N. E. 847; *State v. Dierlamm,* 189 La. 544, 180 So. 135; *Prather v. State,* 76 Okla. Crim. 385, 137 P. 2d 249; *State v. Haworth,* 24 Utah 398, 68 P. 155.

The precise point here involved does not seem to have been previously decided in this State. Results consistent with the views herein expressed were reached in *Green v. State,* 96 Md. 384, 54 A. 104, and in *Carey v. State,* 155 Md. 474, 142 A. 497. In *Green,* the defendant made a confession of murder to a Justice of the Peace who took the statements down in question and answer form. Apparently the transcript was never signed by the appellant, but it was admitted, over objection, "as deposed to", by the Justice of the Peace. This Court held the confession to be properly admissible but the specific question as to whether the Justice of the Peace should have been allowed to read from the transcript was not raised, the issue being the voluntariness of the statement. In *Carey,* the defendant confessed to murder in a "question and answer" statement given to the State's Attorney and taken down by a court reporter but apparently never signed by the defendant. This Court once again held the statement to be admissible in evidence, but the question discussed was limited solely to whether it was a voluntary statement and not to the manner in which it was proved.

The Maryland case which seems closest to the present case is *Owens v. State,* 67 Md. 307, 10 A. 210. There certain judges and clerks of an election precinct were convicted of conspiracy to make false returns of votes cast at an election by certifying that certain persons who actually did not vote had voted. The trial court, over objection, permitted a witness to offer in evidence a list of voters which he used in checking off those who had voted. This Court, in an opin-

ion by Alvey, C. J., affirmed this ruling and said (67 Md., at pp. 312, 315-316) : "This, as we have seen from the facts stated, is not the case of the use of a book or entry for the mere purpose of refreshing the faded recollection of a witness. But it is the case of a witness who does not profess to be able to repeat from memory all the details of the transaction in question, but testifies that he made correct entries at the time of the transaction as it progressed, and that he knows that such entries were made in accordance with the truth, and that they faithfully represent the whole transaction as it occurred; and the question is, whether in reason, or upon any well settled doctrine of law, such entries ought to be excluded as evidence, when offered in connection with the testimony of the witness? We certainly knew of no decision in this State that would require the exclusion of such evidence; nor are we aware of any established principle that requires it. On the contrary, we think both decision and principle fully justify its admission. * * * It has been urged in argument that the entry or memorandum can only be used where the witness has no present independent recollection of the transaction referred to. But its admissibility depends upon no such distinction. If the witness swears that he made the entry or memorandum in accordance with the truth of the matter, as he knew it to exist at the time of the occurrence, whether he retains a present recollection of the facts or not, the entry or memorandum is admissible; for though he may have a present recollection, (of doubtful or varying degree of certainty, it may be,) independently of the memorandum, the paper is admissible as means of verification or confirmation of what he states from memory. This is the clear logical deduction from the cases cited. Few men are so gifted with the powers of memory as to be able to recall the details of past transactions with perfect accuracy, especially when such transactions involve great numbers of names, dates, amounts, etc., and therefore the best recollections, and the greatest degree of self-reliance in the statement of past facts, may derive force and reliability from truthful memoranda made at the time of the transaction; and the law always prefers that evidence which insures the greatest degree of certainty in the establishment of truth. The

admissibility, however, of such entry of memorandum, does not depend upon the distinction made in the law, between primary and secondary proof."

We think there was no error in permitting Detective Davis virtually to read his notes in evidence or in permitting Mr. Perkins to read from his stenographic notes. Indeed, we think the trial court might well have admitted Detective Davis' original notes and Mr. Perkins' original notes and a correct transcription thereof into evidence as documents.

Finally, in question (d) the appellant complains that he was prejudiced by the misconduct and inattention of the jurors. Specifically he alleges that it appeared that three of the jurors were inattentive due to sleeping or drowsiness during the reading of the testimony as to the voluntariness of the confessions of the appellant, and that the jury had difficulty in hearing this testimony, both resulting from the manner in which it was read back to the jury by the court reporter. Because of this, he argues, a new trial should be awarded, relying on *Braunie v. State,* 105 Neb. 355, 180 N. W. 567, 12 A. L. R. 658, and 23 C. J. S., *Criminal Law* § 1449(f). The State answers that unless the matter is brought to the attention of the lower court it cannot be raised on appeal. It is conceded that although counsel for appellant were aware of the alleged inattentiveness of the jurors during the trial they failed to bring it to the attention of the court. It is not necessary to pass upon the questions of whether this Court, in a capital case, should review matters not raised in the lower court, and whether under certain circumstances there should be a reversal and a new trial should be awarded because of misconduct and inattentiveness of the jurors, because we believe that a reading of the testimony given in support of the motion for a new trial shows conclusively that there was no misconduct or inattentiveness on the part of the jury. The only evidence in support of the allegation of inattentiveness was the statements of defense counsel that certain jurors appeared to be asleep, and the statement of a newspaper reporter that from where he sat on the opposite side of the courtroom from the jury (approximately 30 feet away) it appeared that one of the jurors was sleeping. He

could not say definitely that anyone was sleeping. Opposed to this testimony is that of the three jurors involved. All denied that they had been sleeping or inattentive or that they did not hear all of the testimony. The State's Attorney also stated that he did not notice any inattentiveness on the part of the jury. In addition, "[t]he length of time the juror was asleep is not shown, nor does it appear what testimony was introduced during that time, nor that it was of any importance or extent, nor whether favorable or unfavorable to the accused. There is no showing that the defendant was in any way prejudiced." *Braunie v. State, supra,* 105 Neb. at 358. Without stronger evidence that the misconduct alleged actually occurred, and a showing of prejudice to the appellant, we cannot say that there are grounds for reversal. As to the harmful effect of the manner in which the testimony concerning the confessions was read to the jury, the appellant also relies on the statement of one of the jurors given at the hearing on a motion for a new trial. This juror admitted that although it was not as easy to hear as when a witness was testifying, the juror stated that he had heard all of the testimony. Once again, we do not think that this is a sufficient showing that the jury did not hear all the testimony and that the appellant was thereby prejudiced.

In view of the above, the judgment must be affirmed.

*Judgment affirmed.*