49 A.3d 359

H. Jeffrey SCHWARTZ, et al.

v.

Arvia JOHNSON.

No. 2556, Sept. Term, 2009.

Court of Special Appeals of Maryland.

June 27, 2012.

Reconsideration Denied Sept. 4, 2012.

462

Michael J. Baxter (Tara M. Clary, Baxter, Baker, Sidle, Conn & Jones, PA, on the brief), Baltimore, MD, for Appellant.

Stephen J. Hughes & Gregory L. Lockwood (Treanor Pope & Hughes, PA, on the brief), Towson, MD, for Appellee.

Panel: WOODWARD, HOTTEN and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned).

WOODWARD, J.

This appeal arises from a medical malpractice case in which appellee, Arvia Johnson, claimed negligence against appellant, H. Jeffrey Schwartz, M.D., and vicarious liability against appellant, H. Jeffrey Schwartz, M.D., P.A. Prior to trial, Johnson filed a motion in limine to bar the introduction of informed consent evidence, which the Circuit Court for Baltimore City granted, thus excluding any evidence or mention of informed consent. The case proceeded to a five-day jury trial. During the trial, appellants objected to the testimony of Johnson's expert witness, arguing that the expert presented new opinions not previously disclosed in discovery. The trial court overruled the objection and then allowed the testimony as rebuttal evidence in response to appellants' defense theory. Appellants also made a motion to strike a juror for bias and then another motion to strike the same juror for juror misconduct; the trial court denied both motions. At the end of the trial, the jury found that Dr. Schwartz's negligence caused Johnson's injuries and awarded Johnson past medical expenses in the amount of $23,791.19 and non-economic damages in the amount of $650,000.00.

On appeal, appellants present three questions for review by this Court, which we have rephrased: [1]

 1. Did the trial court err or abuse its discretion by excluding evidence that appellants advised Johnson of the risks and complications of a colonoscopy, which evidence was offered by appellants in support of its defense of

---

[1]. Appellants, in their brief, presented the following questions for review by this Court:

 1. Should [appellants] have been prevented from offering evidence that they advised [Johnson] of the risks and complications of a medical procedure, when [Johnson] admitted being advised and that complication occurred?

 2. Should a juror who stated early in the case that he had decided in favor of [Johnson], and who was repeatedly late and often inattentive, have been replaced by an alternate juror?

 3. Should [Johnson]'s sole expert witness have been allowed to offer expert medical opinions that had never been disclosed in discovery?

assumption of the risk and of compliance with the standard of care?

2. Did the trial court abuse its discretion by refusing to strike a juror for alleged bias and misconduct?

3. Did the trial court abuse its discretion in allowing Johnson's expert witness to present an expert medical opinion as rebuttal evidence that had not been disclosed in discovery?

For the reasons set forth herein, we shall answer questions 1, 2, and 3 in the negative and thus shall affirm the judgment of the trial court.

## BACKGROUND

On September 12, 2008, Johnson filed a complaint against appellants, claiming that Dr. Schwartz was negligent by "failing to properly perform the elective outpatient colonoscopy to ensure that [ ] Johnson's colon was not perforated [and] failing to employ an appropriate and careful technique." Johnson alleged that, as a result of Dr. Schwartz's negligence, he "suffered and continues to suffer severe conscious pain and suffering, has required multiple medical treatments and surgeries to correct this condition, has ongoing symptoms of Short Bowel Syndrome which are permanent, and has otherwise been injured and damaged." Johnson also claimed that H. Jeffrey Schwartz, P.A., was vicariously liable for Dr. Schwartz' negligence.

On October 16, 2009, Johnson filed a "Motion in Limine to Bar Introduction of Informed Consent Form or Mention of Doctrine of Informed Consent by Defendant." Johnson argued that, because he had not pled a claim of lack of informed consent, "any testimony or documentary evidence pertaining to that issue would be legally irrelevant, and could only serve to confuse the jury on the relevant issue of [appellants'] medical and surgical negligence." Appellants responded that evidence of informed consent was relevant to their affirmative defense of assumption of the risk, and thus "[a]t a minimum the jury should not be prevented of considering evidence

supporting such a defense." On November 2, 2009, the trial court granted Johnson's motion in limine.

A five-day jury trial was held from November 2, 2009 through November 6, 2009. Evidence was presented through the testimony of Dr. Schwartz, Dr. Richard Dwoskin, Johnson's expert in internal medicine and gastroenterology, Johnson, Dr. Kenneth Maxwell Brown, appellants' internal medicine expert, and Dr. David Kafonek, appellants' gastroenterology expert.

On the first day of trial, appellants' counsel explained during his opening statement that "part of the dispute is, did [the injury] happen when the tip was going in and cut a hole on the way in or cut a hole on the way out with the tip or did it happen a different way; a way called bowing." Counsel set forth appellants' theory of the case, namely that Dr. Schwartz performed the colonoscopy "correctly" and that the "tear or perforation resulted from a complication or risk called bowing."

On the second day of trial, Dr. Dwoskin testified that, to a reasonable medical probability, he believed that Dr. Schwartz "departed from standards of care in the manner in which he performed th[e] colonoscopy on [ ] Johnson." Specifically, Dr. Dwoskin stated that the injury to the colon was caused by "mechanical damage with the instrument itself" namely, "the tip of the colonoscope against the wall of the colon." Later, Johnson's counsel asked Dr. Dwoskin: "[A]ssume it was a bowing injury [and not a tip injury]. If it were a bowing injury would that mean there was no negligence on the part of Dr. Schwartz?" Appellants' counsel objected, arguing (1) that, when "the doctor was deposed in this case[,] [he] offered no opinions about whether a bowing injury would or would not be a breach of the standard of care," and (2) that Johnson's counsel had the responsibility to supplement Dr. Dwoskin's expert opinion with his opinion regarding bowing injuries, so that appellants would have had the opportunity to question him about such opinion prior to trial. Johnson's counsel responded that Johnson was not obligated to supplement Dr.

Dwoskin's expert opinion, because appellants had not asked for Dr. Dwoskin's opinion on a bowing injury in an interrogatory or at deposition, and instead, had questioned Dr. Dwoskin about his opinion, which related solely to a tip injury. Johnson's counsel further argued that, regardless, "this [wa]s not a new opinion" of Dr. Dwoskin, because he "still doesn't believe this [wa]s a bowing injury," and that "this [wa]s really rebuttal testimony," because Dr. Dwoskin would not be available for rebuttal "after [appellants'] experts testify to say this bowing nonsense is just that." The trial court agreed with Johnson's counsel, overruled appellants' objection, and allowed Johnson's counsel to "ask it essentially as rebuttal testimony."

That same day, during Dr. Dwoskin's cross-examination and before the presentation of appellants' case, Alternate Juror Number 2 ("Alternate Juror 2") passed a note to the court, which stated that Alternate Juror 2 heard Juror Number 4 ("Juror 4") say: "I know we shouldn't discuss it, but I'm ready to finish this." When the court questioned Alternate Juror 2 about the note, Alternate Juror 2 stated that he also heard Juror 4 also say: "He cut him, he should get paid." Juror 4 denied having come to any conclusive opinions about the case and denied having told anyone any of his opinions about the case. Appellants' counsel moved to strike Juror 4. The court then questioned the remaining jurors; two jurors heard a juror either comment that the trial was going to take three or four days or asked why the trial was taking three or four days, but each juror stated that they were not influenced by the comment or question; the remaining jurors stated that they had not heard any such comment or question and that they had not formed any opinions about the case. Subsequently, the court denied appellants' motion to strike Juror 4.

On the fourth day of trial, during the direct examination of Dr. Kafonek, Juror 4 requested a break. At this point, appellants' counsel requested to approach the bench and expressed his concern that Juror 4 was "observed on multiple occasions" to be "nodding and his eyes looking like he's getting sleepy and ready to fall asleep." Appellants' counsel

asked that everyone "watch that as well," but did not ask for any further relief.

During the cross examination of Dr. Kafonek, appellants' counsel again asked to approach the bench. Appellant's counsel asserted that Juror 4 had fallen asleep for the fifth time that day, had to ask for a recess, and had been "late almost everyday." Appellants' counsel stated that he did not want a mistrial, but that he thought Juror 4 needed to be "replaced" and requested that Juror 4 be "excused." The court denied the request, explaining that the court had observed that Juror 4 had been "particularly attenti[ve]," "very keen as to what's going on," and "d[id]n't look anymore drowsy than anyone else looks and anymore alert than anyone else looks."

As previously stated, at the conclusion of trial, the jury found that Dr. Schwartz was negligent and that his negligence was the cause of Johnson's injuries. The jury awarded damages to Johnson in the amount of $23,791.19 for past medical expenses and in the amount of $650,000.00 for non-economic damages.

On November 13, 2009, appellants filed a motion for new trial, which the court denied in an order entered on January 13, 2010. On January 14, 2010, appellants filed a notice of appeal to this Court. Additional facts will be set forth below as necessary to resolve the questions presented.

## *DISCUSSION*

### I.

### MOTION IN LIMINE REGARDING INFORMED CONSENT EVIDENCE

On October 16, 2009, Johnson filed a "Motion in Limine to Bar Introduction of Informed Consent Form or Mention of Doctrine of Informed Consent by Defendant." Johnson argued that, because he had not "asserted a cause of action claiming violation of informed consent," the informed consent form was "irrelevant." He further contended that "any mention by [appellants] of this doctrine should be prohibited."

Johnson asserted that appellants "may seek to introduce the standard preoperative consent form signed by [ ] Johnson [ ] and may also attempt to introduce evidence that [Johnson] was otherwise warned of the possibility of colonoscopy complications," in "hope [of] escap[ing] the consequences of [Dr. Schwartz's] surgical negligence by persuading the jury that [ ] Johnson somehow assumed the risk that the operation would result in a perforation of his colon." Johnson concluded that "any testimony or documentary evidence pertaining to that issue would be legally irrelevant, and could only serve to confuse the jury on the relevant issue of [appellants'] medical and surgical negligence."

On October 27, 2009, appellants filed an opposition to Johnson's motion. Appellants responded that the failure to allege a cause of action for violation of informed consent was "irrelevant to the introduction of evidence regarding the consent by [Johnson] to the surgery at issue." Appellants contended that their "entire defense is premised on the contention that bowel perforation is an accepted risk or complication of colonoscopy." Appellants further argued that the evidence of informed consent is relevant to their affirmative defense that Johnson assumed the risk, and thus "[a]t a minimum the jury should not be prevented of considering evidence supporting such a defense." Because, according to appellants, "[a]ll of the experts in this case ... agree that perforation is a known risk of even the most carefully performed colonoscopy," and because "these risks were clearly explained to [Johnson], a reasonable jury could conclude that he accepted the risk of the perforation for the benefit of knowing whether he had bowel cancer."

On November 2, 2009, prior to the beginning of trial, the court held a hearing on Johnson's motion in limine. Johnson argued that "[i]nformed consent is not a defense to negligence." Johnson asserted that, although Maryland "has not spoken to this issue," his research indicated that of all the "other states that have addressed this have held that informed consent information cannot be presented in a negligence case." He further contended that he was "unable to find any appellate opinion where the assumption of the risk defense was

upheld in a medical malpractice case." According to Johnson, if the court were to allow an assumption of the risk defense to be asserted in the instant case, it would be "contrary to the medical malpractice law of [ ] Maryland" and "relieve[ appellants] of any responsibility for the consequences of [Dr. Schwartz's] conduct[;] [i]n other words, if Johnson has assumed the risk, whether [Dr. Schwartz wa]s negligent makes no difference."

Appellants responded that Johnson was essentially arguing that "in Maryland, assumption of the risk is no longer a defense available in a negligence case involving a physician professional malpractice." Appellants pointed to *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991), in support of the proposition that, although it may be rare, "there may be cases where assumption of the risk in a medical malpractice case is, in fact, an issue." According to appellants, a screening colonoscopy case is "exactly the kind of case where assumption of the risk" should be permitted as a defense in a medical malpractice case, because a screening colonoscopy is a test that "you can decline" and decide not to accept after hearing the potential risks. Appellants explained that they were not contending that "Johnson consented to negligence" and suggested that the court could instruct the jury that Johnson "did not accept the risk of negligence being performed on him. He accepted the risk of a perforation occurring in a certain number of these cases absent negligence as every expert has testified to."

In response, Johnson proposed that, to avoid confusing the jury and "run[ning] the risk of the jury using information improperly," the court

let [appellants'] counsel make exactly the argument he said he intends to make which is that these [perforations] happen in so many cases and this was one of these unavoidable cases. Let [Johnson] argue that this was due to negligent technique, not one of those unavoidable cases and lea[ve] **the informed consent issue out entirely, which all of**

**these courts that have considered it have found to be the appropriate avenue.**

(Emphasis added).

The trial court determined that assumption of risk would not be an available defense:

[I]t appears that the assumption of risk functions as a complete bar to recovery because, it is a previous abandonment of the right to complain if something occurs. And that's the problem that I've had, [appellants' counsel], with regard to the consideration of the issue in this case.

The court finds that in this case even with the deposition testimony that these perforations occur absent medical negligence, to allow [appellants] to put forth the defense of assumption of risk as an abandonment of the right to complain about whatever occurred to [Johnson], I'll have to side with [Johnson] in that regard. [Appellants] will be able to argue that which was just argued before the court with regard to the motion in limine in this case. But the motion in limine is granted in this case.

(Quotations omitted).

Appellants then asked the trial court to reconsider its decision, because, even if the defense of assumption of risk was not permitted, appellants should be permitted to "put in valid evidence of discussions that happened in advance that corroborate the center of what [Dr. Schwartz] says why he didn't do something wrong." Appellants argued that such evidence was relevant to the case "when it's in the records, it's part of the process that went on and it is really the heart of the [d]efense that Dr. Schwartz and his experts are going to offer ... it's offered to corroborate the essence of the [d]efense."

After a brief recess, the court ruled, in pertinent part:

Knowledge by the jury of informed consent does not help [Johnson] prove negligence nor does it help [Dr. Schwartz] show he was not negligent. The admission of evidence concerning a Plaintiff's consent could only serve to confuse a jury because the jury could conclude contrary to the law

and evidence that consent to the surgery was ta[nt]amount to consent to the injury which resulted from the surgery.

The jury could conclude waiver in this case and that would be plainly wrong. The issue of informed consent has become irrelevant. Again, the motion is granted.

(Quotations omitted).

### The Parties' Contentions

Appellants argue on appeal that they were "unjustifiably prevented from presenting their primary defense," because they were unable to present evidence of informed consent. Specifically, appellants contend, as they did before the trial court, that "[i]n defense of a negligence action, a defendant may assert that the plaintiff assumed the risk of injury, thereby barring recovery completely." Appellants claim that under Maryland law, "assumption of the risk is a permissible defense in medical negligence actions." Appellants state that, had they been able to introduce such evidence, they would have shown that Dr. Schwartz provided Johnson with "a comprehensive explanation of the alternatives, risks and benefits of undergoing the proposed procedure," including "informing [ ] Johnson of the risk of bowel perforation." Thus, according to appellants, "[a]fter having been duly informed, [ ] Johnson knowingly accepted the risk of perforation despite the proper performance of the procedure." Moreover, appellants contend that, although assumption of the risk may not be appropriate for a case involving life-saving treatment, a colonoscopy is a screening procedure, which Johnson "absolutely could have simply declined."

Appellants also argue, as they did before, that evidence of Dr. Schwartz's disclosure of the risk of bowel perforation to Johnson was part of the proper medical and surgical performance of a colonoscopy and thus was relevant to the standard of care. Appellants point to the deposition testimony of Johnson's expert "that physicians are required by applicable medical standards to warn their patient[s] prior to colonoscopy of known risks, such as perforation." Appellants conclude that "the jury should have been allowed to hear evidence of how

[Johnson's] own expert admitted, at least in one report, that Dr. Schwartz provided competent care."

Johnson responds that "assumption of the risk is almost never available as an affirmative defense" in a medical malpractice negligence action. He explains that "[a] patient who consents to a procedure with knowledge of an unavoidable risk of complication does not waive the right to complain of physician negligence that causes that complication."

Johnson also argues that, because the concepts of medical negligence and lack of informed consent are "separate and distinct" and his claims are based on appellants' "active negligence," the doctrine of informed consent is not at issue in the instant case Thus, according to Johnson, evidence of informed consent is "both irrelevant and unduly prejudicial in medical malpractice cases without claims of lack of informed consent." (Internal quotations omitted).

Finally, Johnson argues that appellants were "fully permitted" to and did introduce expert testimony that he "suffered a known complication resulting from appropriate, non-negligent care." Johnson concludes that "[t]he grant of the Motion in Limine in no way limited Appellants' ability to present evidence that [ ] Johnson's perforation was a non-negligent complication."

## A.

### Assumption of the Risk

"[T]o establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *ADM P'ship v. Martin*, 348 Md. 84, 90–91, 702 A.2d 730 (1997). The doctrine of assumption of risk arises from "an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward [him] and to take [his] chances from harm from a particular risk." *Id.* at 91, 702 A.2d 730 (quotations

and citation omitted). In other words, assumption of risk means voluntarily "incurring that of an accident which may not occur, and which the person assuming the risk may be careful to avoid after starting." *Id.* (quotations and citation omitted). Whether the plaintiff "voluntarily exposed" himself to a known risk, "there must be some manifestation of consent to relieve the defendant of the obligation of reasonable conduct." *Id.* at 92, 702 A.2d 730 (quotations and citation omitted).

■ Maryland recognizes assumption of risk as an affirmative defense. *See* Md. Rule 2–323(g). If the defendant establishes assumption of risk by the plaintiff, it "functions as a complete bar to recovery because it is a previous abandonment of the right to complain if an accident occurs." *ADM P'ship,* 348 Md. at 91, 702 A.2d 730 (quotations and citation omitted).

■ In Maryland, assumption of risk may be a defense in a medical malpractice case, but as the Court of Appeals recognized in *Newell,* it is a "rare situation" where assumption of risk is an issue. 323 Md. at 730, 594 A.2d 1152 (quotations and citation omitted). We have not found any Maryland authority, and the parties have not cited to any such authority, that applies an assumption of risk defense in a medical malpractice case such as the instant one. Therefore, we shall resolve this issue by reference to relevant cases from our sister jurisdictions.

### 1.

### When Assumption of Risk Defense is Permitted

A review of cases from our sister jurisdictions indicates that assumption of risk has been recognized as a defense in medical malpractice cases in certain discrete factual circumstances:[2]

---

**2.** We note that in *Estate of Reinen v. N. Ariz. Orthopedics, Ltd.,* 198 Ariz. 283, 9 P.3d 314 (2000), the Supreme Court of Arizona held that a trial judge could not instruct a jury that the patient "did not voluntarily assume the risk of negligence by the Defendants, but [the patient] did voluntarily assume the risks relating to the refusal to take or receive

(1) where the patient refused treatment suggested by a physician; and (2) where the patient elects to follow unconventional medical treatment. Two cases, *King v. Clark,* 709 N.E.2d 1043 (Ind.Ct.App.1999) and *Boyle v. Revici,* 961 F.2d 1060 (2d Cir.1992), which appellants cite to support their position, specifically address these two situations.

### Patient's Refusal of Treatment Suggested by Physician

In *King,* the patient, appellant, filed a complaint against her physician, appellee, asserting that he "failed to timely diagnose and treat [her] breast cancer." 709 N.E.2d at 1045. At the conclusion of all of the evidence at a jury trial, the appellant moved for judgment with respect to the issues of contributory negligence and incurred risk.[3] *Id.* at 1046. The trial court denied her motion, gave instructions with regard to contributory negligence and incurred risk, and entered judgment upon the jury's verdict in favor of the appellee. *Id.* In her appeal, the appellant challenged the trial court's instruction to the jury regarding contributory negligence and incurred risk. *Id.* The Indiana Court of Appeals upheld the

transfusions of blood or blood products" because, under the Arizona Constitution, the jury is the "sole arbiter of all things relating to assumption of the risk." *Id.* at 319–20 (emphasis omitted). Article XVIII, Section 5 of the Arizona Constitution provides: "The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury." Consequently, the Court concluded that the trial judge's instruction was reversible error. *Reinen,* 9 P.3d at 320. Because of a specific constitutional provision regarding the defense of assumption of risk, Arizona sits in a unique position with how assumption of risk may be applied in a medical malpractice case. No such provision exists in Maryland law.

3. Under Indiana law, assumption of the risk and incurred risk are essentially the same doctrines. *See Hardin v. Christy,* 462 N.E.2d 256, 263 n. 3 (Ind.Ct.App.1984) ("While some courts have limited the term 'assumption of the risk' to cases in which the parties stand in some sort of contractual relation, and have created other terms, such as 'incurred risk' for other cases, this is generally considered a distinction without a difference. Hence the terms are essentially interchangeable."); *Gyuriak v. Millice,* 775 N.E.2d 391, 394 n. 1 (Ind.Ct.App.2002) ("We use the terms 'incurred risk' and 'assumed risk' interchangeably because they basically describe the same concept.").

trial court's jury instructions regarding contributory negligence and incurred risk. *Id.* at 1047–48. With regards to incurred risk, the Court stated that "a patient's ... incurred risk operates as a complete defense to medical negligence." *Id.* at 1046. The Court specifically determined that the evidence most favorable to the verdict supported a finding of contributory negligence or incurred risk, because the appellant

> waited three to four weeks before seeking a medical evaluation of the symptomatic left breast in October of 1993. Moreover, she did not report her symptoms when she contacted [the appellee]'s office on October 16, 1993. [The appellant] also delayed an additional five weeks before obtaining the diagnostic testing that [the appellee] had ordered.

*Id.* at 1047.

Furthermore, the Court noted that the appellant sought treatment from another doctor who diagnosed her with cancer, advised her that this was an "aggressive cancer requiring immediate treatment," and referred her to an oncologist. *Id.* The oncologist recommended that the appellant "immediately begin six courses of chemotherapy, followed by a mastectomy, radiation therapy, and more chemotherapy." *Id.* The appellant "elected to disregard" the oncologist's recommendations and sought consultations from other physicians. *Id.* The appellant ignored the recommendation of another doctor with whom she consulted one month later, and eventually took the recommendation of a subsequent doctor and began treatment on January 31, 1994. *Id.* The appellant, however, completed only four of the six chemotherapy sessions. *Id.* From these facts, the Court of Appeals in *King* determined that "the jury could have concluded that [the appellant]'s conduct may have demonstrated a disregard for the risk, and that she may have voluntarily incurred the risk of disregarding the recommendations of four physicians to undergo a mastectomy and treatment." *Id.* at 1048.

Several other states have held assumption of the risk to be an available defense in similar factual situations. For instance, in *Connelly v. Warner*, 248 A.D.2d 941, 670 N.Y.S.2d 293 (1998), the Supreme Court of New York, Appellate Division, held that, in a case based "solely on medical malpractice" with no separate cause of action for lack of informed consent, the trial court did not err in failing to strike the affirmative defense of assumption of risk where the patient refused to have a naso-gastric tube inserted prior to surgery. *Id.* at 295.

In *Baxley v. Rosenblum*, 303 S.C. 340, 400 S.E.2d 502 (App.1991), the Court of Appeals of South Carolina held that, based on the particular facts of the case, the trial judge had a duty to submit the defense of assumption of risk to the jury in a medical malpractice action. *Id.* at 507. The appellant was the appellee's patient *and* was a doctor himself. *Id.* at 504. The Court determined that,

> [i]n this case, the evidence permitted a reasonable inference that [the patient] voluntarily chose to incur known medical risks. In 1984, [the physician] made a preoperative diagnosis of cancer of the bladder. From that time forward, if not before, [the patient] knew a person with his symptoms is at risk for cancer. He also knew a patient takes a serious health risk when he withholds information about his symptoms and their progression, and when he ignores his doctor's recommendations for treatment. We have already detailed evidence showing that [the patient] did both of these things. He knew there was a risk of complications from the May 1987 surgery that would require further treatment. In each instance, he made a voluntary decision to take the risk.... On the basis of this evidence, the trial judge had a duty to submit the defense of assumption of the risk to the jury.

*Id.* at 507.

In *Lyons v. Walker Reg'l Med. Ctr.*, 868 So.2d 1071 (Ala. 2003), the Supreme Court of Alabama held that, in a claim for medical malpractice, the trial court did not err in "charging the jury on ... assumption of the risk over [the appellant]'s

objection" where the patient had refused all treatment for his condition, even though he was warned of the serious consequences that could arise. *Id.* at 1085. The Court held:

> The jury, in applying the court's charge on contributory negligence and assumption of risk to all of the testimony, could have concluded that [the patient], with knowledge of the seriousness of his sickness and with the appreciation that it posed significant danger, including death, failed to exercise care for his own safety, by putting himself in the way of the danger about which he was warned, including death.

*Id.* at 1088.

### Patient's Election to Follow Unconventional Medical Treatment

In *Boyle*, a cancer patient was advised by conventional cancer specialists to undergo surgery to resect her tumor. 961 F.2d at 1062. The patient, however, decided to explore noninvasive alternatives, and consulted with the appellant about what cancer treatments he could offer her. *Id.* The appellant's treatments consisted of "urine monitoring, urinalyses and the ingestion of various mineral compounds that [the appellant] claim[ed] retard and reduce the size of cancerous tumors." *Id.* The appellant testified that he had alerted the patient that "his medications were not FDA approved and that he could offer no guarantees." *Id.* Despite this admonition, the patient decided to go forward with the appellant's cancer treatment, and within a year, passed away. *Id.*

On appeal, the appellant claimed that the trial court "erred by failing to instruct the jury to decide whether the decedent expressly assumed the risks that caused her injuries." *Id.* at 1061–62. The Second Circuit defined "express assumption of risk" under New York law as "result[ing] from agreement in advance that defendant need not use reasonable care for the benefit of plaintiff and would not be liable for the consequence of conduct that would otherwise be negligent." *Id.* (quotation and citation omitted). The Court recognized that it had previously held in *Schneider v. Revici*, 817 F.2d 987 (2d

Cir.1987) that "a jury charge on express assumption of risk is proper in medical malpractice cases where a patient knowingly forwent conventional medical treatment and instead accepted the risks that caused the injuries." *Boyle*, 961 F.2d at 1062. In other words, "a patient may expressly assume the risk of malpractice and dissolve the physician's duty to treat a patient according to the medical community's accepted standards." *Id.* at 1063. The Court determined that the appellant had presented evidence that the patient had "expressly assumed a risk in opting for the unconventional cancer treatment," and reversed the judgment of the trial court. *Id.*

### 2.

### When Assumption of Risk Defense is Inapplicable in Medical Malpractice Case

■ As explained above, our review of out-of-state case law indicates that the viability of assumption of risk as a defense in medical malpractice cases, premised on negligence as opposed to informed consent, is limited to certain factual situations. The rationale for the limited viability of the assumption of risk defense in a medical malpractice action may be explained by the elements of the defense itself; for a person to "assume the risk," he or she must have had knowledge of the risk of the danger, appreciated that risk, and voluntarily accepted that the risk could occur. *See ADM P'ship*, 348 Md. at 90–91, 702 A.2d 730. Therefore, in the healthcare context, for a patient to have "assumed the risk" of a negligent medical procedure, he or she must have voluntarily accepted the risk that the doctor would negligently complete the procedure. Such a factual scenario, however, will almost never occur.

In our view, for a court to hold that a patient assumed the risk of a physician acting negligently in a medical procedure is "tantamount to a finding that the [physician] owed no duty" to the patient. *Storm v. NSL Rockland Place, LLC*, 898 A.2d 874, 880 (Del.Super.Ct.2005). We agree with the Superior Court of Delaware's rationale for this conclusion in *Storm:*

**[T]here is virtually no scenario in which a patient can consent to allow a healthcare provider to exercise less than "ordinary care" in the provision of services.**[4] Even if given, a patient's consent to allow a healthcare provider to exercise less than ordinary care would be specious when considered against the strict legal, ethical and professional standards that regulate the healthcare profession. **Regardless of whether the patient elects to have healthcare or requires it, the patient appropriately expects that the treatment will be rendered in accordance with the applicable standard of care.** This is so regardless of how risky or dangerous the procedure or treatment modality might be.

*Id.* at 884 (footnote omitted) (emphasis added).

 Furthermore, the very nature of actions involving medical malpractice limits the applicability of the assumption of risk defense. As courts in other jurisdictions have recognized, "[t]he disparity in knowledge between [doctors] and their [patients] generally precludes recipients of [medical] services from knowing whether a [doctor]'s conduct is in fact negligent." *Morrison v. MacNamara,* 407 A.2d 555, 567 (D.C. 1979). *See also Dennis v. Jones,* 928 A.2d 672, 677 (D.C.2007); *King v. Solomon,* 323 Mass. 326, 81 N.E.2d 838, 840 (1948); *Los Alamos Med. Ctr. v. Coe,* 58 N.M. 686, 275 P.2d 175, 179 (1954); *Kelly v. Carroll,* 36 Wash.2d 482, 219 P.2d 79, 90 (1950). As the District of Columbia Court of Appeals explained,

[i]n the context of medical malpractice, the superior knowledge of the doctor and his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain

---

4. The Superior Court of Delaware recognized that "[t]he only such scenario that the Court can envision is where the patient gives informed consent to undergo an experimental medical procedure where the standards of care have not yet been fully developed or consents to treatment modalities known to be outside of the medical mainstream." *Storm v. NSL Rockland Place, LLC,* 898 A.2d 874, 884 n. 41(Del.Super.Ct.2005).

medical treatments, negates the critical elements of the defense, *i.e.*, knowledge and appreciation of the risk. Thus, save for exceptional circumstances, a patient cannot assume the risk of negligent treatment.

*Morrison*, 407 A.2d at 567–68. *See also Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 705–06 (1992) (stating that a patient "by voluntarily encountering" a risk of injury does not " 'impliedly consent' to negligently inflicted injury or 'impliedly agree' to excuse the surgeon from a normal duty of care").

■ Accordingly, we hold that, except in cases involving a refusal or delay in undergoing recommended treatment or the pursuit of unconventional medical treatment, a healthcare provider cannot invoke the affirmative defense of assumption of risk in a medical malpractice claim brought by his or her patient where a breach of informed consent has not been alleged.

### 3.

### The Instant Case

■ In the case *sub judice*, Dr. Schwartz performed a routine diagnostic screening colonoscopy on Johnson. The record reflects that Johnson neither refused any treatment recommended to him by Dr. Schwartz, nor did he pursue an unconventional form of treatment. Therefore, the facts in the instant case are distinguishable from the situations in which a defense of assumption of risk have been applied in medical malpractice actions.

■ Furthermore, based on our holding and the supporting rationale above, we conclude that the defense of assumption of risk is not applicable in the case *sub judice*. Dr. Schwartz's argument that Johnson voluntarily assumed the risk of a bowel perforation confuses the defense of assumption of risk with a defense to a claim of a breach of informed consent. A bowel perforation, according to Dr. Schwartz, is a normal and usual complication associated with

the performance of a colonoscopy, and thus can occur *without* any negligence on the part of the physician. The defense of assumption of risk, however, assumes that the defendant, *i.e.*, a doctor in a malpractice case, was negligent. *See ADM P'ship*, 348 Md. at 92, 702 A.2d 730 (stating that "there must be some manifestation of consent *to relieve the defendant of the obligation of reasonable conduct* ") (quotations and citation omitted) (emphasis added). Dr. Schwartz did not concede in the trial court, nor does he in this appeal, that he was negligent in the performance of the colonoscopy on Johnson. What Dr. Schwartz is arguing, in essence, is that Johnson voluntarily assumed the risk of a *non-negligent* complication of a colonoscopy. That can be raised only as a defense to a claim of a breach of informed consent, which claim was not brought by Johnson in the instant case. In other words, a patient's voluntary assumption of a risk normally associated with a particular medical treatment or procedure, after having been properly informed of the same, occurs in virtually every case and does not relieve the physician of compliance with the applicable standard of care. To hold otherwise would mean that Johnson consented to allow Dr. Schwartz to exercise less than ordinary care when Dr. Schwartz conducted the colonoscopy. Accordingly, we hold that the trial court did not err in ruling that the defense of assumption of risk was not available to Dr. Schwartz.

## B.

### Informed Consent

Appellants next contend that Johnson's "decision to not assert a lack of informed consent claim . . . should not have prevented [appellants] from showing that the discussion occurred," because such discussion "was part of the proper medical and surgical performance of a colonoscopy." They claim that "[t]he Court's ruling on [Johnson]'s Motion denied the jury essential relevant information." They assert that, at a minimum, they were "entitled to have evidence of the informed consent submitted to the jury" with "appropriate

instruction[s]" on the role of informed consent "as evidence of Dr. Schwartz's compliance with the standard of care." We disagree.

▮▮▮▮▮ "Breach of informed consent and medical malpractice claims both sound in negligence, but are *separate, disparate theories* of liability." *McQuitty v. Spangler*, 410 Md. 1, 18, 976 A.2d 1020 (2009) (emphasis added). A patient alleging an informed consent claim complains that "a healthcare provider breached a duty to obtain effective consent to a treatment or procedure." *Id.* at 18–19, 976 A.2d 1020. The doctrine of informed consent thus

> imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

*Sard v. Hardy*, 281 Md. 432, 439, 379 A.2d 1014 (1977). The physician's "duty to disclose" requires that the physician explain to the patient "the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment." *Id.* at 440, 379 A.2d 1014. Breach of informed consent must be pled as a separate count of negligence. *Zeller v. Greater Balt. Med. Ctr.*, 67 Md.App. 75, 83, 506 A.2d 646 (1986).

▮▮▮▮ In comparison, a patient alleging medical malpractice argues that a "healthcare provider breached a duty to exercise ordinary medical care and skill based upon the standard of care in the profession." *McQuitty*, 410 Md. at 18, 976 A.2d 1020. In other words, medical malpractice is "predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability." *Dehn v. Edgecombe*, 384 Md. 606, 618, 865 A.2d 603 (2005) (quotations and citation omitted). Because claims of informed consent and medical malpractice are "separate, disparate theories of liability," we agree with John-

son that evidence of appellants providing informed consent to Johnson is irrelevant to Johnson's medical malpractice claim. *See McQuitty*, 410 Md. at 18, 976 A.2d 1020. Accordingly, the trial court did not err by precluding the admission of evidence of informed consent.

Even if evidence of informed consent was relevant, cases from our sister jurisdictions indicate that the admission of such evidence in a medical malpractice case would be prejudicial to the patient. The opinion of the Supreme Court of Connecticut in *Hayes v. Camel*, 283 Conn. 475, 927 A.2d 880 (2007) is instructive.

In *Hayes*, the Court determined that other state courts that "have considered this issue uniformly have concluded that evidence of informed consent, such as consent forms, is both irrelevant and unduly prejudicial in medical malpractice cases without claims of lack of informed consent." 927 A.2d at 888–89. As part of its rationale, the Court explained:

Knowledge by the trier of fact of informed consent to risk, where lack of informed consent is not an issue, does not help the plaintiff prove negligence. Nor does it help the defendant show he was not negligent. In such a case, the admission of evidence concerning a plaintiff's consent could only serve to confuse the jury because the jury could conclude, contrary to the law and the evidence, that consent to the [procedure] was tantamount to consent to the injury which resulted from that surgery. In effect, the jury could conclude that consent amounted to a waiver, which is plainly wrong.

*Id.* at 889 (quoting *Wright v. Kaye*, 267 Va. 510, 593 S.E.2d 307, 317 (2004)). Stated differently, "whether the plaintiff patient had given informed consent to [a] procedure generally is irrelevant and 'carrie[s] great potential for the confusion of the jury' in an action wherein only medical malpractice is pleaded, and the information given to the plaintiff is not at issue." *Id.* (first alteration added) (second alteration in original) (quoting *Waller v. Aggarwal*, 116 Ohio App.3d 355, 688 N.E.2d 274, 275 (1996)).

In the instant case, during its deliberations, the jury asked questions about what types of warnings Johnson received from Dr. Schwartz regarding the colonoscopy. One juror sent a note asking: "Is pt's [sic] warned of what could happen during this procedure such as Bowing?" Another juror sent a note asking: "Is the risk explain [sic] to a person before the colonoscopy?" We agree with Johnson that these notes "demonstrate[d] the risk that the jury would have confused the[ ] issues [ ] had the informed consent evidence been allowed." In other words, if the court had admitted the evidence that Dr. Schwartz had obtained informed consent from Johnson, there would have been a risk of misuse of the informed consent evidence by the jury, and, as the trial court stated, the jury "could conclude waiver in this case and that would be plainly wrong." Accordingly, we hold that, even if relevant, the trial court did not abuse its discretion in excluding the evidence of informed consent.

## II.

## JUROR BIAS AND MISCONDUCT

When a party alleges that a juror is guilty of bias or misconduct, the party must prove that the bias or misconduct "actually occurred" and that he or she was "prejudiced" by the bias or misconduct. *Wright v. State*, 24 Md.App. 309, 313, 330 A.2d 482, (1975).

When reviewing a trial judge's decision about whether to exclude a juror, "we will give deference to the trial judge's determination and will not substitute our judgment for that of the trial judge unless the decision is arbitrary and abusive or results in prejudice to the defendant." *State v. Cook*, 338 Md. 598, 615, 659 A.2d 1313 (1995).[5] The rationale for such

---

5. Maryland Rule 2–512(f)(3) governs the discharge of a jury member in a civil case. The language in Rule 2–512(f)(3) is identical to the language in Maryland Rule 4–312(f)(3), which governs the discharge of a jury member in a criminal case. "Because the words of the civil and criminal rules are identical, and because there is a Maryland constitu-

deference is "based on the fact that in evaluating the excluded juror, the trial judge has the opportunity to question the juror and observe his or her demeanor." *Id.* Furthermore, the trial judge is "physically on the scene, able to observe matters not usually reflected in a cold record[, and] has his finger on the pulse of the trial." *Id.* (quotations and citation omitted).

Appellants argue that the court should have replaced Juror 4. They contend that "[j]uror misconduct is an absolute ground for dismissal" and that juror misconduct includes sleeping, inattentiveness, and "[a] juror's indication of a fixed opinion on the merits prior to submission of the case for deliberations." They assert that Juror 4's "denial of some of the accusations was unconvincing at best and varied during the course of the Court's questioning of him." They further claim that "[t]he fact that other jurors confirmed that he was indeed talking about the case before [appellants] had opened their case in chief, which was a violation of the Court's instructions not to do so, combined with the evidence of him not paying attention and/or falling asleep during [appellants]' case, was ample evidence of juror misconduct warranting his dismissal."

Johnson responds that "[t]here is no evidence of juror bias or misconduct that merits setting aside the jury verdict." He contends that appellants failed to demonstrate "with specificity that [J]uror [4] was sleeping or inattentive" and did not make any "affirmative showing of prejudice." Johnson further relies on the court's observations that Juror 4 had been "particularly attenti[ve]. . . . He's very keen as to what's going on. . . . [H]e doesn't look anymore drowsy than anyone else looks and anymore alert than anyone else looks." [6] As to bias,

---

tional right to a jury trial in civil as well as criminal cases," the opinions stemming from Rule 4–312(f)(3) are "direct authority in civil as well as in criminal cases." *Grimstead v. Brockington*, 417 Md. 332, 354 (2010).

**6.** Johnson contends that appellants did not preserve this issue for review on appeal, because appellants' counsel never moved for a mistrial when the court refused to replace Juror 4. Appellants, however, made two motions to strike Juror 4, and we determine that such motions were sufficient to preserve the issue for review by this Court.

Johnson points to the other jurors' statements that they had "not formed any opinions about the case as a result of [Juror 4's] comment."

Because appellants allege separate incidents of bias and misconduct by Juror 4, we will address each incident separately.

## A.

### Juror Bias

On the second day of trial, during the cross-examination of Dr. Dwoskin, Alternate Juror 2 passed a note to the trial court, which read: "Madam [sic] Court—Juror # 4 discussed his view on this case at the start of the day. 'I know we shouldn't discuss it, but I'm ready to finish this . . .'" (Ellipsis in original). The court asked Alternate Juror 2 to approach the bench and questioned him regarding the note:

THE COURT: . . . You're juror seated in alternate seat number two?

[ALTERNATE JUROR 2]: That's correct.

THE COURT: Is this your handwriting, sir?

[ALTERNATE JUROR 2]: That's correct.

THE COURT: All right. In this [you] say juror number four discussed his views on this case at the start of the day. That's the gentleman seated in seat number four?

[ALTERNATE JUROR 2]: That's correct.

THE COURT: And you quote, "I know we shouldn't discuss it, but I'm ready to finish this"; is that correct?

[ALTERNATE JUROR 2]: Yes.

THE COURT: Did you hear that come from juror number four yourself?

[ALTERNATE JUROR 2]: That's correct.

THE COURT: And was the full panel of jurors in the room at the time?

[ALTERNATE JUROR 2]: I think there was somebody in the bathroom maybe, but besides that, yes.

* * *

THE COURT: [W]as it made to the general body?

[ALTERNATE JUROR 2]: To the general body.

THE COURT: Was there discussion on the case as a result of this comment?

[ALTERNATE JUROR 2]: No, it was completely silent.

THE COURT: Was completely silent.

[ALTERNATE JUROR 2]: Silent until we entered the court.

THE COURT: Silent as you entered the court. To your knowledge did anyone respond to that comment?

[ALTERNATE JUROR 2]: No.

THE COURT: Did you respond to that comment?

[ALTERNATE JUROR 2]: No.

* * *

THE COURT: Did juror number [four] state what his opinion on the case was to your recollection?

[ALTERNATE JUROR 2]: To my recollection no, but it was—had a negative connotation to it.

THE COURT: Had a negative connotation meaning the inflexion [sic] of the—or his tone of voice or what?

[ALTERNATE JUROR 2]: No, his sense of direction.

THE COURT: His sense of direction.

[ALTERNATE JUROR 2]: Yes.

THE COURT: Did he express a sense of direction to the full body of jurors?

[ALTERNATE JUROR 2]: Yes.

THE COURT: And was there any comment with regard to his sense of direction as you saw it by the jurors?

[ALTERNATE JUROR 2]: No.

THE COURT: While I have you here, have you made up your mind about this case with regard to what you've heard or seen?

[ALTERNATE JUROR 2]: No.

[JOHNSON'S COUNSEL]: Did you have an understanding about the sense of direction that he was stating?

[ALTERNATE JUROR 2]: Actually, yes. Yesterday before we even started the case there was another comment by juror number [four] as well.

THE COURT: Do you recall what that comment was[?]

[ALTERNATE JUROR 2]: He cut him, he should get paid.

THE COURT: And was there any response from any other jurors with regard to that comment to your recollection?

[ALTERNATE JUROR 2]: No.

THE COURT: Did you respond to that juror with regard to that comment?

[ALTERNATE JUROR 2]: No.

THE COURT: And as a result of that comment have you made up your mind about the case?

[ALTERNATE JUROR 2]: No.

The court then questioned Juror 4:

THE COURT: ... It's my understanding through certain communications you have expressed any kind of a statement about the case.

[JUROR. 4]: No.

THE COURT: Have you indicated to anyone within the jury that, "I know we shouldn't discuss it, but I'm ready to finish this case."

\*　　\*　　\*

[JUROR 4]: No, not like that, no.

THE COURT: Well, what did you say?

[JUROR 4]: What I said was, I know we shouldn't discuss the case itself, but I said it doesn't seem like it's going to be four days.

\*　　\*　　\*

THE COURT: And when did you make that comment? Was that earlier today?

[JUROR 4]: That was actually before we even got started. That was actually yesterday. I said it doesn't seem like it's going to be a four day thing.

THE COURT: Okay. Have you made any comments with regard to having your own opinion about the case?

[JUROR 4]: Oh, no, no. I don't give my opinion. That's— I'm actually sit in the back quiet.

THE COURT: You were sitting in the back quiet?

[JUROR 4]: Yeah. Everybody was actually. . . .

\* \* \*

THE COURT: You understand the court's admonition with regard to not discussing the case?

[JUROR 4]: Yes, I do.

THE COURT: Even making comments with regard to how long you think the case may take?

[JUROR 4]: I understand that.

THE COURT: Or expressing any opinion about the case with regard to the testimony or any of the exhibits or any of the evidence or anything of that nature?

[JUROR 4]: Yes, sir. I understand.

THE COURT: And are you able to adhere to that?

[JUROR 4]: Yes, sir.

THE COURT: Let me ask you this, have you made an opinion about the case with regard to how you think the case should go?

[JUROR 4]: No, no, I haven't.

THE COURT: Have you made an opinion known to anyone, whether the jury or anyone outside of this courtroom as to the way—which way you think this should go?

[JUROR 4]: No. No, I haven't.

THE COURT: Have you formed an opinion about the case as to which way you think it should go based on what you've heard so far?

[JUROR 4]: Just on—based on the evidence—I haven't heard all the evidence, so I can't base it on because I haven't heard both sides either. So, I haven't seen their witnesses, so I don't have an opinion either way yet.

Appellants' counsel made a motion to strike Juror 4. The court then questioned the remaining jurors. The foreperson indicated that Alternate Juror 2 passed the note directly to the court and that she never saw the note. She recalled that one of the jurors stated that "[h]e thought that [the case] was going to take four days," but did not recall him saying anything else. She stated that she did not think that Juror 4 had reached any opinion about the case. She asserted that this had not influenced her in any way that would cause her to "make up [her] mind prior to hearing all the evidence in this case" and that she was able to be fair and impartial.

Of the remaining jurors, only Juror 3 had heard a juror say, "why is it taking three or four days"; the other jurors stated that they had not heard any comments about the case from any of the jurors. All of the jurors indicated that they had not formed any opinion regarding the case. As a result, the court denied appellants' motion to strike Juror 4.

Appellants argue that Juror 4's "denial of some of the accusations was unconvincing at best," and that, because the other jurors "confirmed" that he talked about the case prior to the presentation of appellants' case, that the trial court should have stricken Juror 4. We disagree.

Appellants are required to do more than just contend that bias occurred; they must prove that the bias "actually occurred" and that they were prejudiced by such bias. *Wright,* 24 Md.App. at 313, 330 A.2d 482. The record reflects that, upon questioning by the court, Juror 4 admitted to stating that "it doesn't seem like it's going to be a four day thing," but denied making any comments regarding "having [his] own opinion about the case." Juror 4 further affirmed that he understood the court's instructions to not discuss the case with any of the other jurors, that he was able to "adhere" to the

court's instructions, and that he had not formed any opinion about the case.

The court then questioned the other jurors, and only Alternate Juror 2, Juror 3, and the foreperson heard Juror 4 comment about why the trial was going to take four days, but were not influenced by the statement. All the remaining jurors stated that they had not heard any statement by Juror 4 and had not formed any opinion about the case.

Appellants did not adduce any evidence to contradict these statements. In other words, appellants failed to prove that Juror 4 actually violated the trial court's instructions by making up his mind prior to the submission of the case for deliberations or by communicating his opinion of the case to the other jurors. Furthermore, appellants did not show that they were prejudiced by Juror 4's statement about the length of the trial, because only three jurors heard the statement, none of the jurors were affected by it, and none of the jurors had formed any opinion about the case as a result of the statement.

Although appellants also contend that Juror 4's denial and explanation were "unconvincing" as indicated above, we defer to the trial judge's determination, because the trial judge had the "opportunity to question [Juror 4] and observe his [ ] demeanor." *Cook,* 338 Md. at 615, 659 A.2d 1313. Accordingly, we hold that the trial court did not abuse its discretion in deciding not to strike Juror 4 for bias.

### B.

### Juror Misconduct

On November 5, 2009, the fourth day of trial, during the direct examination of Dr. Kafonek, Juror 4 requested a break. At this time, appellants' counsel asked to approach the bench and stated:

> I just want to note for the record that before we took the break at the request of [Juror 4] that he was observed on multiple occasions—four times by Dr. Schwartz's count with

his nodding and his eyes looking like he's getting sleepy and getting ready to fall asleep. I've seen that before, but not to the point where—not today—but not to the point where I've come to the bench. I simply ask to the extent the court can watch that as well as everyone else in the courtroom that you do that. I'm not asking for any relief at this point.

That same day, during the cross examination of Dr. Kafonek, appellants' counsel requested to approach the bench, when the following colloquy took place:

[APPELLANTS' COUNSEL]: Juror number four is falling asleep.

[JOHNSON'S COUNSEL]: He's not.

[APPELLANTS' COUNSEL]: ... I just looked over he had his head down, he had his eyes closed. When I stood up apparently he looked up.

THE COURT: Okay.

[APPELLANTS' COUNSEL]: It's the fifth time today. He's had to ask for a recess. He's been late almost everyday.

THE COURT: And you're requesting?

[APPELLANTS' COUNSEL]: **Well, I mean, I don't want a mistrial.**

THE COURT: Right.

[APPELLANTS' COUNSEL]: Nobody wants that. But I think that Dr. Schwartz—and Dr. Schwartz is the one pulling my sleeve and I got a client to represent here. So, I mean, I think I have to—I think there's something physiological going on. I don't think there's anything— this fellow is not trying to do that, but **I think he needs to be replaced and I request that he be excused.**

[JOHNSON'S COUNSEL]: Absolutely not. I mean, I've participated in cases where jurors close their eyes, put their heads down, nod on occasion.

\* \* \*

... This fellow has actually within our observation been one of the most attentive throughout the course of this

trial. I think he's also one who had indicated that he was diabetic and earlier in the trial had to take a break to get something to eat. I believe that was him. But through-out—other than what counsel is describing today—and I must say I haven't noticed it, although I do not doubt what counsel says he and his client may have observed—other than this fairly brief episode of this trial, this guy has been very attentive.

THE COURT: **My observations of the juror over the course of the trial is that he's been particularly atten-ti[ve]** (inaudible) when a witness comes down and pres-ents testimony right at the bar. **He's very keen as to what's going on.** Today, I don't know if he's particularly sleepy or anything like that. I mean, **he doesn't look anymore [sic] drowsy than anyone else looks and anymore [sic] alert than anyone else looks.**

He has given the court the—**he has said to the court that he suffers from diabetes and that one day we addressed that and it seemed to perk him up in some respects.**

I note your request to dismiss him, but I'm not going to dismiss him at this time. Rest assure [sic] your client that you had made those concerns again now on the record itself and I will keep an eye on the juror through-out the course of the proceedings.

(Emphasis added).

▄▄ Appellants claim that "the evidence of [Juror 4] not paying attention and/or falling asleep during [appellants]' case" warranted his dismissal. As explained above, appellants must support their claim by "prov[ing] that the misconduct actually occurred and that [appellants] w[ere] prejudiced thereby." *Wright,* 24 Md.App. at 313, 330 A.2d 482.

In *Hall v. State,* 223 Md. 158, 177, 162 A.2d 751 (1960), the Court of Appeals addressed the issue of misconduct committed by a sleeping juror. In *Hall,* the Court reviewed the evidence presented by counsel for the party alleging juror inattentive-ness; specifically, the Court considered counsel's statement

that "certain jurors appeared to be asleep" and a newspaper reporter's statement that "it appeared that one of the jurors was sleeping," but he could not say "definitely" that anyone was sleeping. *Id.* at 177–78, 162 A.2d 751. The Court weighed this evidence against statements from the three jurors involved, all of whom denied sleeping or being inattentive, and a statement from the opposing counsel that "he did not notice any inattentiveness on the part of the jury." *Id.* at 178, 162 A.2d 751. In determining that "[t]here [wa]s no showing that the defendant was in any way prejudiced," the Court also emphasized that "[t]he length of time the juror was asleep is not shown, nor does it appear what testimony was introduced during that time, nor that it was of any importance or extent, nor whether favorable or unfavorable to the accused." *Id.* (quotations and citation omitted). The Court concluded that, "[w]ithout stronger evidence that the misconduct alleged actually occurred, and a showing of prejudice to the appellant, we cannot say that there are grounds for reversal." *Id.*

█ In the case *sub judice*, appellants' argument that Juror 4 was sleeping and inattentive is supported by the statements of Dr. Schwartz and his counsel. Weighing against their statements are (1) Johnson's counsel's statement that he had not noticed any inattentiveness and that Juror 4 "ha[d] actually within our observation been one of the most attentive throughout the course of this trial"; and (2) the trial court's own observations of Juror 4. In particular, the trial court observed that "over the course of the trial . . . [Juror 4 has] been particularly attenti[ve] . . . when a witness comes down and presents testimony right at the bar. He's very keen as to what's going on." The court also noted that "he doesn't look any more drowsy than anyone else looks and any more alert than anyone else looks." As explained above, where the trial court has the opportunity to observe the juror's demeanor, we will defer to the court's observations. *Cook,* 338 Md. at 615, 659 A.2d 1313. Therefore, the evidence presented supports the conclusion that the trial court's decision not to strike

Juror 4 for sleepiness or inattentiveness was not an abuse of discretion.

Even if the evidence supported the conclusion that Juror 4 was inattentive or sleeping, appellants did not adduce sufficient evidence to show that they were prejudiced. Appellants stated that they observed Juror 4 falling asleep on the fourth day of trial, when appellants presented Dr. Kafonek for examination. There was no evidence, however, about the length of time that Juror 4 was asleep, what testimony was being introduced during that time, or whether such testimony was of any importance or favorable or unfavorable to appellants. *See Hall,* 223 Md. at 178, 162 A.2d 751. Without such evidence, as in *Hall,* we cannot conclude that appellants were prejudiced by the trial court's decision not to strike Juror 4. Accordingly, we hold that the trial court did not abuse its discretion in deciding not to strike Juror 4.

## III.

## EXPERT TESTIMONY

On the first day of trial during opening statements, appellants' counsel explained that "part of the dispute is, did [the injury] happen when the tip was going in and cut a hole on the way in or cut a hole on the way out with the tip or did it happen a different way; a way called bowing." Appellants' counsel explained appellants' theory of the case to the jury, specifically that Dr. Schwartz "performed [the colonoscopy] correctly and that the tear or perforation resulted from a complication or risk called bowing," which appellants contended could happen without "negligence or mistake." On several occasions during his opening statement, appellants' counsel asserted that their experts would testify about what bowing is and why they believed that the injury "was that bowing complication."

During the presentation of his case-in-chief, Johnson called Dr. Dwoskin as his expert in internal medicine and gastroenterology. During direct examination, Dr. Dwoskin testified that, to a reasonable degree of medical probability, Dr.

Schwartz "departed from standards of care in the manner in which he performed this colonoscopy on[ ] Johnson" when Dr. Schwartz "caused a tear in . . . this portion of the colon in [ ] Johnson." He further explained that Dr. Schwartz tore Johnson's colon through "mechanical damage with the [colonoscope] itself." With mechanical damage, Dr. Dwoskin indicated that there are two types of injuries that can occur, one caused by "bowing" of the colonoscope and one caused by the "tip" of the colonoscope. He testified that "it's likely that the tip of the scope was bent," and it was the tip, not any bowing of the colonoscope, that caused Johnson's injury.

After eliciting Dr. Dwoskin's opinion that Dr. Schwartz breached the standard of care by causing Johnson's injury with the tip of the colonoscope, Johnson's counsel asked Dr. Dwoskin about bowing injuries:

> [JOHNSON'S COUNSEL]: Now, doctor, you talked about the possibility of a bowing injury and that the circumferential nature of this injury was inconsistent with bowing. Is that your testimony?

> [DR. DWOSKIN]: Yes. Bowing injuries, stretching injuries, looping injuries, it's the same thing, are typically along the long a[xis]. They're called longitudinal, the long a[xis].[7]

> [JOHNSON'S COUNSEL]: But, doctor, I want you to assume for purposes of my question that this was a bowing injury of some kind. Now, I understand your testimony that the physical evidence is inconsistent with that, but assume that it was a bowing injury. If it were a bowing injury would that mean there was no negligence on the part of Dr. Schwartz?

Appellants' counsel objected and requested to approach the bench. The following colloquy then took place:

---

7. The trial transcript of Dr. Dwoskin's testimony originally read: "Bowing injuries, stretching injuries, looping injuries, it's the same thing, are typically along the long access. They're called longitudinal, the long access." Based on Dr. Dwoskin's earlier testimony, it is clear that Dr. Dwoskin likely said "axis" and not "access."

[APPELLANTS' COUNSEL]: ... [T]he doctor was deposed in this case and offered no opinions about whether a bowing injury would or would not be a breach of the standard of care.... [W]e asked have you told us all your opinions about the breaches, he said, yes, it was a tip injury and that ... if it was the tip injury it violated the standard of care. And I object to him offering new opinions that we have not had an opportunity to conduct discovery on.

[JOHNSON'S COUNSEL]: First of all, they didn't ask him if it was a bowing injury and if it was a bowing injury whether it was negligent. He can't answer the unasked question. The reason they didn't ask it is because the bowing theory came up for the first time in the opinions of their experts who were deposed after Dr. Dwoskin.

Now, I don't know if they knew about their bowing theory when they deposed Dr. Dwoskin or not, but they never asked him about a bowing injury and if it w[as] a bowing injury whether it would be negligent.

THE COURT: But they did ask him what exactly [was] his opinion on all of the injuries.

[APPELLANTS' COUNSEL]: Yes.

[JOHNSON'S COUNSEL]: No. What they asked was, doctor, what do you believe the negligence here is? And he said the negligence is he perforated the colon with this twisting technique and I hold that opinion to a reasonable degree of medical probability. They never asked him about any alternate theory.

Now they come in here with an alternate theory of bowing and he was never asked that at his deposition and that's on them, not on us.

\* \* \*

I want him to be able to render an opinion that if bowing was the technique—it was never asked of him before and not even raised until their expert's deposition. But if this were a bowing injury, would that signify negligence?

[APPELLANTS' COUNSEL]: Two points. One is he was asked, have you told us all of the opinions you hold as to any negligence of Dr. Schwartz. This gentleman has told us from his general information bank that he knows that there are bowing mechanisms of injury. So that if his opinion was that it was a tip, I think it's incumbent upon him to tell us in deposition even if I'm wrong, even if it's some other mechanism, it violates the standard of care.

\* \* \*

... Second—and we asked him, tell us all of your opinions months and months and months ago. Second point: [appellants'] experts were deposed months ago. If [Johnson's counsel] is standing before you and claiming that's the first time he learned that bowing might possibly be raised in this case and this gentleman was of the opinion that oh, if that's the theory then I have new opinions, then it was incumbent upon [Johnson] to tell [appellants] in some shape, form or manner, letter, phone call, supplemental answers to interrogatories that this witness had new opinions and that we would be entitled to question him about it.

We have had no opportunity to question him about it, no opportunity to explore this line of his testimony that he apparently is ready to give now and I think we're entitled to that.

[JOHNSON'S COUNSEL]: Very simply. This witness does not hold the opinion that this is a bowing injury. They didn't ask him about a bowing injury and even the possibility of it. The word bowing was never asked by them at their deposition.

THE COURT: But he has been asked about what his opinions are.

[APPELLANTS' COUNSEL]: And how it happened.

\* \* \*

[JOHNSON'S COUNSEL]: Because it was responsible for them to know their expert's theory before they took ours

[sic] deposition. He can't object now to my—**see, I can't recall this guy, he's going back to Florida.**

THE COURT: Right.

[JOHNSON'S COUNSEL]: So I could recall him in rebuttal and say, after their experts testify, what do you think. Dr. Dwoskin?

[APPELLANTS' COUNSEL]: What [Johnson's counsel] hasn't address[ed] is why in the months since the completion of [Johnson's] depositions when they said what they thought was the theory and this gentleman apparently disagreed and he knew that months ago, he never alerted the court or me about this until today, the second day of trial.

\* \* \*

[JOHNSON'S COUNSEL]: It is not a—it is not an interrogatory answer.

[APPELLANTS' COUNSEL]: That's not the point.

\* \* \*

[JOHNSON'S COUNSEL]: We have no responsibility to go back and answer and [sic] unasked question in their deposition. They took a relatively short deposition of this witness. They asked him what his opinion was; he gave it. We didn't even know about a bowing theory at that point. How could I have raised it with him at that point? They knew about it. They could have asked him about it, but they didn't.

**And this is really rebuttal testimony. He won't be here after their experts testify to say this bowing nonsense is just that.**

THE COURT: Well, I know what it is now because—**I'll allow you to ask it essentially as rebuttal testimony—**

\* \* \*

—as to what he's going to say. But I think counsel has a point with regard to once he finds out what your expert is going to say, he re-depose his. You find out what his expert is going to say and you know what his expert is

going to say and then you come back and say my guy says it's either bowing or it's not bowing.

\* \* \*

With regard to the objection it's on the record. I will overrule the objection. I'll allow the testimony in and we'll leave it at that.

(Emphasis added).

Johnson's counsel then resumed his direct examination of Dr. Dwoskin:

[JOHNSON'S COUNSEL]: ... I understand that it is your opinion that this was not a bowing injury, correct?

[DR. DWOSKIN]: Correct.

[JOHNSON'S COUNSEL]: All right. But if you assume for purposes of my question that this was a bowing injury, do you have an opinion that you can state to a reasonable degree of medical probability as to whether that mechanism of injury would signify negligence on the part of Dr. Schwartz?

\* \* \*

[DR. DWOSKIN]: Yes, I do have an opinion.

\* \* \*

That that would also be negligent[.]

Appellants argue that Johnson never disclosed Dr. Dwoskin's opinion regarding Dr. Schwartz's negligence, assuming the injury had been caused by bowing, in any of the discovery conducted in the case, including Dr. Dwoskin's "deposition, in response to the Court's Scheduling Order which required disclosure of expert opinions[,]" or in interrogatory responses. Appellants assert that, despite Johnson's failure to disclose Dr. Dwoskin's "additional opinions," the trial court permitted him to testify about this issue over appellants' objection. Appellants contend that they have been "unfairly prejudiced," because the court "allow[ed] an expert witness to offer an entirely new, previously undisclosed, and completely prejudicial theory of liability in the middle of trial[.]" They argue that this is at odds with the "purpose of discovery," which is

"to prevent a party from proceeding to trial in a confused or muddled state of mind regarding the facts and claims in dispute" and "to avoid ambush at trial."

Johnson responds that "the testimony of [Dr. Dwoskin] was permissible rebuttal evidence," and not the introduction of "a new theory of liability." He asserts that appellants concede that this was "rebuttal testimony," and, according to Johnson, such rebuttal testimony is "a matter for the exercise of judicial discretion," which will not be reversed unless the ruling was "both 'manifestly wrong' and 'substantially injurious.'" Johnson contends that appellants were "in no way prejudiced by the brief general 'rebuttal' testimony of Dr. Dwoskin being offered during [Johnson's] case," and thus the court did not abuse its discretion.

Johnson also argues that (1) Dr. Dwoskin was deposed before any of appellants' experts were disclosed or deposed; and (2) appellants' counsel never questioned Dr. Dwoskin at his deposition about their bowing theory. Johnson claims that his counsel questioned Dr. Dwoskin about the defense theory at trial after hearing appellants' counsel "advance[ ] the theory" in appellants' opening statement. He contends that appellants cannot argue that they were "unfairly 'surprised'" by Dr. Dwoskin's testimony when (1) "they failed to inquire at his deposition, [ (2) ] heard his testimony a day before any defense expert took the stand, and [ (3) ] they fully and fairly covered with [their] experts their areas of disagreement with Dr. Dwoskin."

This Court previously addressed the issue of rebuttal evidence in the medical malpractice context in *Riffey v. Tonder*, 36 Md.App. 633, 375 A.2d 1138, *cert. denied*, 281 Md. 745 (1977). We defined rebuttal evidence as "any competent evidence which explains, is a direct reply to or a contradiction of material evidence introduced by ... a party in a civil action" during the other party's presentation of their case. *Id.* at 645–46, 375 A.2d 1138. In other words, "[a]lthough rebuttal evidence is a matter of right, for evidence to be admissible as 'true' rebuttal ... it must respond to new

matter." Joseph F. Murphy, Jr., Maryland Evidence Handbook 104 (Matthew Bender, 4th ed., 2010).

 Whether evidence is properly admitted as rebuttal testimony involves two different inquiries: "(1) whether the proffered evidence does or does not satisfy the rebuttal ... standard; and (2) regardless of the answer to this question, whether the proffered evidence should be admitted or excluded." *Id.* In *Holmes v. State*, 119 Md.App. 518, 525 n. 1, 705 A.2d 118 (1998), this Court addressed the standard for reviewing the admission of rebuttal evidence:

> Because it is not always easy to draw the line between what is rebutting evidence and what is evidence properly adducible in chief, it is often stated that the admissibility of rebuttal testimony rests within the sound discretion of the trial court. The trial judge does, for example, have discretion to vary the order of proof ... The trial judge has discretion to exclude rebuttal ... No trial judge, however, has discretion to make an erroneous finding of fact. When the question is whether proffered evidence does or does not explain, contradict, and/or reply to a new matter introduced by the other side, the trial judge's finding of fact will be affirmed unless it is clearly erroneous. When the question is whether rebuttal ... evidence was erroneously admitted or excluded for some other reason, the trial judge's ruling will be affirmed unless it was manifestly wrong.

(Quotations and citations omitted).

 In the case *sub judice*, appellants introduced in their opening statement to the jury their theory that Dr. Schwartz "performed [the colonoscopy] correctly and that the tear or perforation resulted from a complication or risk called bowing." Appellants also told the jury that their theory would be supported by their experts' testimony. In contrast, Dr. Dwoskin testified, in Johnson's case in chief, that Dr. Schwartz caused Johnson's injury with the tip of the colonoscope against the wall of the colon. Johnson's counsel then posed a hypothetical to Dr. Dwoskin, asking him to "assume for the purposes of [the] question that this was a bowing injury, do you

have an opinion that you can state to a reasonable degree of medical probability as to whether that mechanism or injury would signify negligence on the part of Dr. Schwartz?" Dr. Dwoskin's testimony in response to Johnson's hypothetical thus did not go to Johnson's own theory of causation, and, instead, was rebuttal evidence that "explain[ed] [and] [wa]s a direct reply to" appellants' theory of causation. *See Riffey*, 36 Md.App. at 645, 375 A.2d 1138.

■ Although rebuttal evidence is typically introduced after the defendant's case is completed, *see* Murphy, Maryland Evidence Handbook at 104, the trial judge has the discretion to vary the order of proof. *See Sippio v. State*, 350 Md. 633, 665, 714 A.2d 864 (1998). *See also* Md. Rules 5–611(a). In the instant case, Dr. Dwoskin had to return to Florida after his testimony, and thus was unavailable to testify in Johnson's rebuttal case. Under the circumstances, the trial judge permissibly accepted rebuttal evidence prior to the presentation of appellants' evidence. *See Sippio*, 350 Md. at 665, 714 A.2d 864. Accordingly, the trial court did not abuse its discretion in allowing Dr. Dwoskin's opinion as to appellants' theory of the case as rebuttal testimony in Johnson's case in chief.

■ The focus of appellants' argument, however, is that they were "unfairly prejudiced" by the admission of Dr. Dwoskin's testimony regarding bowing, because this "entirely new, previously undisclosed, and completely prejudicial theory of liability" was unknown to them prior to trial, and therefore "[t]his trial by surprise put the[m] at an insurmountable disadvantage." Appellants support this argument by claiming that Johnson was required to, but never did, supplement Dr. Dwoskin's expert opinions with his opinions regarding bowing.

Maryland Rule 2–402(g) provides:

A party by interrogatories may require any other party to identify each person, other than a party, whom the other party expects to call as an expert witness at trial; to state the subject matter on which the expert is expected to testify; to state the substance of the findings and opinions to which the expert is expected to testify and a summary of

the grounds for each opinion; and to produce any written report made by the expert concerning those findings and opinions. A party also may take the deposition of the expert.

If under Rule 2–402(g), appellants had asked Johnson through interrogatories to "state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion," then Johnson would have been required to supplement his interrogatory responses "promptly" with any expert opinion of Dr. Dwoskin that was obtained prior to trial. *See* Md. Rule 2–401(e). Johnson is correct, however, that he did not have the responsibility to supplement a *deposition;* his duty was to supplement any other response to "a request or order for discovery." *Id.*

From the record before the trial court, it is unclear whether appellants actually propounded such an interrogatory on Johnson. Although appellants represented that they propounded interrogatories on Johnson, they did not direct the trial court to any interrogatory propounded on Johnson regarding the disclosure of expert opinions. Appellants argued to the trial court that Johnson found out about appellants' causation theory at their experts' depositions and, in anticipation of presenting Dr. Dwoskin to testify about bowing at trial, Johnson should have supplemented his interrogatory answer prior to trial with Dr. Dwoskin's expert opinion on bowing. Johnson argued that Dr. Dwoskin's opinion was not presented in an interrogatory answer and, instead, was presented at deposition; thus he argued that he did not have to supplement Dr. Dwoskin's opinion.

As previously indicated, the trial court was not shown any of the interrogatories propounded by appellants on Johnson. Had the trial court been able to review those interrogatories, it could have determined whether appellants had asked Johnson for Dr. Dwoskin's expert opinions and grounds for such opinions, and, if so, under Rule 2–401(e), Johnson would have been required to supplement Dr. Dwoskin's opinions. Based on the arguments presented to the trial court, appellants had

asked about Dr. Dwoskin's opinions at *deposition*, and not through a discovery method that would require supplementation under Rule 2–401(e). Therefore, the trial court did not err in failing to find a discovery violation by Johnson.[8]

Moreover, appellants did have the opportunity to question Dr. Dwoskin about his opinions regarding bowing in his deposition, but failed to do so. The bowing theory was, in fact, appellants' theory of causation. Appellants presumably knew of their own theory of causation at the time of Dr. Dwoskin's deposition and could have asked Dr. Dwoskin about the bowing theory at that point. Also, because Dr. Dwoskin's opinion on bowing was presented in Johnson's case in chief, instead of in Johnson's rebuttal case, appellants were able to have their experts comment on Dr. Dwoskin's bowing opinion in the defense case. Therefore, even if Johnson should have disclosed Dr. Dwoskin's opinion on the bowing theory of causation prior to trial, the trial court's failure to exclude such opinion did not prejudice appellants and thus was not an abuse of discretion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; APPELLANTS TO PAY COSTS.**

---

**8.** In the argument before the trial court, appellant's counsel did not specify any rule of procedure requiring Johnson to supplement Dr. Dwoskin's expert opinion with his opinion about appellants' theory of causation, which was not raised at Dr. Dwoskin's deposition and not revealed until the later deposition of appellants' experts. Indeed, appellants' counsel simply told Johnson's counsel that "[y]ou're responsible for telling me your expert's opinions." In their brief before this Court, appellants point to the trial court's Scheduling Order and their Interrogatories in support of the requirement of supplementation. Appellants, however, failed to cite to the trial court any provision of the Scheduling Order or any specific interrogatory in support of their argument. Under these circumstances, we cannot conclude that the trial court erred on this issue.